COURT INVESTMENT COMPANY, A CORPORATION, *ET AL.*, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. MILLIE PERILLO AND DONATO PERILLO, HER HUSBAND, DEFENDANTS-APPELLANTS.

Argued October 24, 1966—Decided December 23, 1966.

*Mr. Frank B. Bozza* argued the cause for plaintiffs-respondents and cross-appellants.

*Mr. Maurice Rosenstein* argued the cause for defendants-appellants.

The opinion of the court was delivered by

FRANCIS, J. The issue here is whether the trial court erred in reopening a default judgment obtained on November 24, 1945 by plaintiff Court Investment Company against defendants Millie Perillo and Donato Perillo, husband and wife. The Appellate Division, with Judge Kilkenny dissenting, reversed and reinstated the judgment. Defendants appealed to this Court. *R. R.* 1:2–1.

On May 10, 1928 defendants gave a bond and third mortgage on their premises in Newark, N. J. to Salvatore Carrera to secure an indebtedness of $1800. On June 8, 1928 Carrera assigned the mortgage to Court Investment as "collateral" security for a mortgage on his own premises at another location in Newark, N. J. The first mortgagee instituted a foreclosure suit on defendants' property on May 23, 1929. Court Investment, the Perillos and others were made defendants; Carrera was not joined in the action. A foreclosure decree was entered and the premises were bought in at the sheriff's sale by the first mortgagee. The purchase price left a substantial deficiency on the first mortgage. Since defendants had made no payments on the $1800 third mortgage held by Court

Investment, the full principal sum remained due after completion of the foreclosure action, and the confirmation of the sale. The order of confirmation was entered on November 23, 1929.

Thereafter Court Investment permitted the matter of the Perillos' liability on their bond to rest without any court proceedings for many years until institution of the action with which we are concerned here and which resulted in the default judgment of $3,600 on November 27, 1945. Plaintiff claims the suit was commenced on May 7, 1943. Defendants contend it was instituted on April 21, 1945, and was barred at that time by the one year limitation on the bringing of such actions set forth in L. 1942, c. 172, N. J. S. A. 2:65–7.1 (now N. J. S. 2A:50–8). The default judgment therein was vacated on January 8, 1963.

As we have said the order confirming the sheriff's sale of defendants' premises to the first mortgagee was entered on November 23, 1929. Thus the lien of plaintiff's subsequent mortgage was cut off as of that date. On May 9, 1942, L. 1942, *Chapter* 172 became effective. It provided:

"Where a bond and a mortgage shall be or have been given for the same debt and the lien of the mortgage has been or shall be extinguished by the foreclosure of a prior mortgage, * * * and sale of the mortgaged premises, action on the bond shall be commenced within 1 year from the date of the confirmation of the sale of the mortgaged premises whereby the lien of said mortgage was or shall be extinguished, except *in cases in which the lien of the mortgage securing payment of a bond has been so extinguished prior to the taking effect of this act, in which cases action upon said bond shall be commenced within one year after this act shall take effect,* unless previously barred, and all such actions not commenced within either of said periods, as the case may be, shall be thereafter completely and forever barred for lapse of time * * *." (Emphasis added.)

Thus if plaintiff intended to sue defendants on their bond the mandate of this statute called for commencement of the action by May 9, 1943.

Plaintiff claims it brought suit on the bond on May 7, 1943, two days before the one-year period ended. That is the date

which appears on the summons, which bears the signature of the Clerk of the Supreme Court and the seal of the Court. However, the summons and complaint were not delivered to the sheriff for service upon defendants until April 21, 1945, almost two years later, and were not filed with the court after service upon defendants until *May 6, 1945*. In the complaint plaintiff alleged that the lien of the mortgage on defendants' property had been "cut off by the foreclosure of a superior mortgage." No pertinent dates of the foreclosure action were set forth. The suit was brought in the name of Court Investment Company and Philip Gaudiosi, "sole acting Trustee in liquidation of Court Investment." Gaudiosi, who later changed his name to Mitchell, was then a member of the New Jersey Bar.

It is appropriate to note here that on March 31, 1945, only 21 days *before* the summons and complaint were delivered to the sheriff for service, Court Investment had given a discharge of the Perillo mortgage to an attorney for a prospective purchaser of the property. Although the first mortgage thereon had been foreclosed, the attorney had raised a title question in behalf of his client, because Carrera, the original Perillo mortgagee and assignor of the mortgage to Court Investment, had not been made a party to the foreclosure action. (Mitchell knew the Perillo property very well. He acquired title to it himself on February 8, 1927. When he sold it and to whom prior to the time the Perillos bought it in 1928, and the seller to the Perillos do not appear in the record before us. Mitchell knew Carrera well also. Carrera built the house on the property and lived there in 1927. Also he acted as rental and collection agent for Mitchell for this and other nearby properties. (See *Gaudiosi v. Micone*, 6 *N. J. Misc.* 425, 141 *A.* 575 (*Sup. Ct.* 1928)). The testimony in the cited case shows that Carrera went into bankruptcy in 1927; Mitchell was his attorney in the proceedings.)

The prospective purchaser's attorney indicated that he would not accept the title or allow his client to complete the purchase of the property unless the then owner-prospective

seller obtained a discharge of the mortgage. Court Investment thereupon furnished the discharge, signed by Philip Mitchell, its president, and acknowledged by his wife, Lillian Mitchell, its secretary. The discharge was recorded on April 10, 1945 by the attorney to whom it had been given. The suit on the bond made no mention of this discharge.

After service of the summons and complaint in the deficiency suit, defendants retained and paid a fee to Samuel Ehrenkranz, then a member of the bar, to represent them. Donato Perillo testified in the present proceeding that Ehrenkranz told him later that the suit was "late" and "everything is all right," and that the matter had been cleared up. Ehrenkranz filed an affidavit of merits, and did nothing further. As a result the $3600 default judgment was entered on November 27, 1945. It now appears that Ehrenkranz had been indicted previously in the United States District Court for the District of New Jersey for using the mails in a scheme to defraud, and for conspiracy to use the mails in a scheme to defraud, and that on April 19, 1943 he had entered pleas of guilty to two such indictments. On one plea he was sentenced to imprisonment of one year and one day, which sentence was suspended, and he was placed on probation for five years. On the other plea he was fined $5,000. On February 23, 1944 the matter of discipline to be imposed upon Ehrenkranz as a member of the New Jersey Bar was referred to the State Board of Bar Examiners for hearing and report to the Supreme Court. Six hearings were held over an extended period, and on May 24, 1945 the Board recommended disbarment. It may be noted that that date is just 18 days after Mr. and Mrs. Perillo had been served with process in the Court Investment suit on the bond. A motion to confirm the report was argued at the October 1945 term of the Supreme Court, and thereafter on September 17, 1946 an order confirming the report was entered. *In the Matter of Samuel Ehrenkranz, An Attorney at Law, Docket No.* 16825 (1944). It seems reasonable to assume that the pendency of these various proceedings involving Ehrenkranz played a material

part in his failure to file an answer or otherwise defend the Court Investment action against the Perillos.

According to Mr. and Mrs. Perillo they knew nothing about the $3600 default judgment against them until 14 years later. In the meantime, on February 14, 1949, the corporate charter of Court Investment had been forfeited for nonpayment of State franchise taxes, and the Perillos had bought another· piece of property in Newark, N. J. In 1959 they sought to obtain an additional mortgage loan thereon and in the course of a title search by the late Nicholas W. Kaiser, attorney for the prospective lender, the Court Investment judgment came to light. The Perillos then engaged Kaiser to take care of the matter. He began negotiations with Mitchell to obtain a warrant to satisfy the judgment, offering a small sum to do so. In the course of the negotiations Kaiser called Mitchell's attention to the discharge of the mortgage, which was recorded before the suit was brought, and also to the claim that the suit was barred, in any event, by the one-year limitation period set out in *N. J. S. A.* 2:65–7.1, *supra.* The negotiations were not fruitful and ultimately, on July 16, 1962, the Perillos instituted the present proceeding which resulted, after an extensive hearing, in the setting aside of the default judgment.

We agree with the trial court and the dissenting judge in the Appellate Division that the judgment should be erased from the record.

Under *R. R.* 4:62–2 a court may relieve a party from a final judgment for

"(a) mistake, inadvertence, surprise, or excusable neglect;

(b) newly discovered evidence which would probably alter the judgment, order or proceeding and which by due diligence could not have been discovered in time to move for a new trial under Rule 4:61–2;

(c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(d) the judgment or order is void;

(e) the judgment or order has been satisfied, released, or discharged, or a prior judgment or order upon which it is based has been reversed

or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or

(f) any other reason justifying relief from the operation of the judgment or order."

A motion to be relieved from a judgment for reasons (a), (b) and (c) must be made not more than a year after the judgment was entered. But if made under (f) the only time limitation is that it be presented within "a reasonable time." ██ Such a motion under (f) is addressed to the discretion of the trial court. That discretion is a broad one to be exercised according to equitable principles, and the decision reached by the trial court will be accepted by an appellate tribunal in the absence of an abuse of its discretion. No categorization can be made of the situations which would warrant redress under *subsection* (f). As Justice Proctor noted in *Hodgson v. Applegate,* 31 *N. J.* 29, 41 (1959), the very essence of (f) is its capacity for relief in exceptional situations. And in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice.

In our judgment there are a number of factors present in this case which in their totality establish adequate equitable grounds for vacation of the judgment. Accepting plaintiff's allegation in the complaint and Mitchell's testimony at the hearing that the Perillo mortgage had been wiped out by foreclosure of the superior lien of the first mortgage, suit on the bond had to be instituted within one year from May 9, 1942, the date on which *L.* 1942, *Chapter* 172, became operative. Plaintiff claims that when he sent the summons and complaint to the Clerk of the Supreme Court and had the Clerk sign the summons and affix the court seal, the suit on the bond against the Perillos had been instituted. And since that date, May 7, 1943, was less than a year after the effective date of *L.* 1942, *Chapter* 172, it urges that the action was not barred by the limitations contained therein. The contention is based upon a misapplication and misuse of the old practice rule which existed for many years prior to 1943. Under that rule a suit was considered commenced within the meaning of a

statute of limitations when a summons was signed and sealed by the clerk of the court at the instance of the attorney for the plaintiff, or by the attorney himself acting under the permissible, and, in fact the then general, practice, as the agent or deputy of the clerk, in good faith for the purpose of being immediately served or proceeded on, *i. e.,* as soon as reasonably possible, if that purpose is not afterwards abandoned. *Lynch v. New York, etc., R. R. Co.,* 57 *N. J. L.* 4 (*Sup. Ct.* 1894); *County, Adm'x v. Pacific Coast Borax Co.,* 67 *N. J. L.* 48, 53 (*Sup. Ct.* 1902); *Mutual Savings Fund Harmonia v. Gunne,* 110 *N. J. L.* 41 (*E. & A.* 1933); *Harris, Pleading and Practice in New Jersey* 584 (*Rev. ed.* 1939); and see *Williams v. Evenstein,* 2 *N. J.* 60, 63 (1949). (The advent of the new court system introduced an objective standard as the basis for deciding when a civil action was commenced, namely, the date of filing of the complaint. *R. R.* 4:3–1.)

The old rule was well known to practitioners. From the facts in this case and Mitchell's testimony it is plain that he knew the rule, and knew also when he sent the summons and complaint to the sheriff for service upon the Perillos, just 16 days short of two years after the summons had been signed and returned to him by the clerk, that he was not within the rule. His testimony makes clear that he did not have the summons tested by the clerk with the good faith intention of actually putting it in motion for the purpose of being served. Manifestly, in order to commence a suit something more was required of an attorney than simply signing or having the summons signed and sealed by a court clerk. *County, Adm'x v. Pacific Coast Borax Co., supra,* 67 *N. J. L.,* at *p.* 53. On questioning by the court the following developed:

"Q. What did you do with the summons and complaint between the time it was tested and the time of delivery to the sheriff?"

A. I filed it.

Q. Where?

A. In my file.

Q. In your office?

A. That's right."

By Mr. Kaiser:

"Q. So it laid there for two years?
A. That's right."

Further inquiry by the court revealed that the summons and complaint had not been filed in the office of the Clerk of the Supreme Court until May 5, 1945. (The Clerk's notation as it appears in the appendix shows May 6, 1945.) Mr. Kaiser then continued:

"Q. And from 1943 until April 21, 1945, when this summons and complaint was delivered to the Sheriff of Essex County, you say you kept that in your files?
A. That's right.
*       *       *       *       *       *       *       *"

By the court:

"Q. Why did you?
A. I just kept it there.
Q. For no apparent reason?
A. That's correct."

Such indifferent attitude toward process and such callous use of it almost two years after its testing, in a willful endeavor to avoid the limitation statute, shows not only lack of good faith but imposition on the court as well. *Cf. Ash v. Cohn,* 119 *N. J. L.* 54 (*E. & A.* 1937).

Furthermore, even assuming there was a flicker of the required type of good faith at the moment the summons was tested, and we are satisfied there was not, patently such good faith was offset by the subsequent conduct of Mitchell. The placing of the summons and complaint in his file after receiving them from the clerk, and knowingly leaving them there for almost two years without reason, manifested an abandonment of the suit. *Lynch v. New York, etc., R. R. Co., supra.* Putting the papers in motion for service upon the defendants after such a long period of interment cannot be considered

a retroactive revival of the summons. In the language of Chief Justice Beasley in *Lynch, supra,* under such a practice if allowed "a suit at law might be actually pending against an unconscious defendant for a series of years. Subject to such a system, who could say when the statute of limitations had barred claims that had been imminent for years? Indeed, by force of the practice contended for, the statute that puts a time restraint upon action would have no claim to be called a statute of repose." 57 *N. J. L.,* at *p.* 6.

■ Under the circumstances for purposes of considering the applicability of *R. R.* 4:62–2 (*f*) here, plaintiff's attempt to revive the abandoned summons amounts to inequitable conduct. Moreover, all that we have said leads to the conclusion that the action which resulted in the default judgment was not brought within the one-year limitation prescribed by *L.* 1942, *Chapter* 172. Consequently the claim was barred.

■ But plaintiff says a statute of limitation is a matter of defense and no answer was filed asserting it; instead after service of process the matter was permitted to go by default. Therefore, plaintiff claims, defendants cannot avail themselves of the untimeliness of the suit at this late date. Putting aside the contention, which we need not reach, that the wording of *L.* 1942, *Chapter* 172, is such that plaintiff's *right* of action had been extinguished, and therefore the court had no power to entertain the suit after the expiration of the pertinent one-year period, a substantial equity in defendants' position must be recognized. Defendants were not educated persons, as the testimony demonstrates, nor were they trained in the law. So they retained and paid an attorney who filed an affidavit of merits for them, and later advised them the suit was late and had been taken care of. Unfortunately for them the attorney was involved in proceedings during this period which ultimately led to his disbarment. Obviously they were unaware of his plight, and since they did not know of the default judgment until years afterward, it was not unreasonable to conclude they had accepted his assurance that the suit against them had been disposed of. This Court

has shown a sympathetic concern for clients whose attorney has been disbarred while representing them in a pending action. In such situations R. R. 1:12–7 requires that they be notified in the manner provided in R. R. 4:5–2 to appoint another attorney in his stead. The rule is not applicable in this instance because Ehrenkranz was not actually disbarred until September 17, 1946. But in considering equities for purposes of R. R. 4:62–2(f) it should not be overlooked that the State Board of Bar Examiners had recommended his disbarment 18 days after the Perillos had been served with process. That must have been about the time defendants retained him to represent them.

In the search for equities made necessary by defendants' resort to *subsection* (f), and in appraising the over-all conduct of plaintiff, attention should also be paid to the discharge of mortgage executed by plaintiff 21 days before suing the Perillos on the bond. Reference was made to it and to its recordation in the initial papers filed by defendants in their application to vacate the judgment. Thereafter, before the first hearing thereon and before the matter reached the Appellate Division, Mitchell filed an affidavit alleging that the discharge "was never intended as such and never intended to extinguish the indebtedness created by the mortgage or the bond which it was given to secure"; and further that it was given purposely in incomplete form to serve "some personal objective" of the person to whom it was delivered. At the hearing in the trial court Mitchell said the discharge was given as an accommodation, a favor, to the attorney for the subsequent purchaser of the Perillo property and his mortgagee, who had refused to accept the title. It was given as a "token paper." Mitchell knew it had to be recorded to be effective, but he said it was not to be recorded. It was just to show that the purchaser and the mortgagee were not "in jeopardy." Plainly its purpose was to persuade the buyer and his mortgagee to complete the purchase of the property.

We need not decide what legal effect, if any, this discharge had upon the cause of action plaintiff presented in the orig-

inal complaint in this action. The giving of the discharge, however, provides further support for our conclusion that Mitchell knew when he sent the summons and complaint to the sheriff for service that the summons had no legal force or value as court process. We have said above that, even assuming some good faith intention when the summons was tested to put it in motion for service (an assumption which is not supportable on the record), that intention was abandoned. The discharge of the mortgage, said to have been given without any monetary consideration, justifies the additional inference that Mitchell knew the statutory limitation on a suit on the Perillo bond had long since expired, and that Court Investment Company in accommodating the attorney for the new purchaser of the property would not be giving up anything of value. Moreover, when defendants sought to build an estoppel against the bond suit on the basis of the discharge, Mitchell's testimonial efforts to avoid the claim further demonstrate his lack of credibility in the entire proceeding.

To avoid defendants' claim that the discharge created an estoppel against a suit on the bond, Mitchell undertook by his testimony to show that the discharge was not a legal or effective instrument. He said it was a "token paper," given as a favor, in incomplete form and not to be recorded. Its use was to be limited to persuading the prospective purchaser of the property that the title to be acquired was free of the defect which concerned his attorney. In other words, Mitchell was willing to participate in what would undoubtedly be a fraud upon the purchaser, if the title was defective. His testimony is incredible. Obviously the discharge was intended to be recorded. Mitchell knew it had to be recorded to be effective. It is inconceivable that the attorney who questioned the title in behalf of the prospective purchaser and additional mortgagee would take the instrument in incomplete form and without intending to record it. The fact that he did record it and that it clearly seems to have been complete when recorded removes any doubt on the subject.

The untrustworthiness of the testimony respecting the discharge of mortgage confirms our conviction that the suit on the bond which resulted in the default judgment was not timely. Additionally, it supports our conclusion that there was a knowingly improper use of worthless process to give the appearance of timeliness to the suit, and thus to obtain acceptance by the court as a legitimate suitor.

In deciding whether the default judgment should be opened under *subsection* (f) of *R. R.* 4:62–2, other factors referred to above array themselves in support of defendants' position. In spite of the existence of an absolute defense to the suit, they were unfortunate enough to get into the hands of a member of the bar who was facing serious disciplinary proceedings. He failed them after advising that the matter had been taken care of satisfactorily. They had every reason to believe him for many years thereafter, until the default judgment fortuitously appeared on the scene. Their new attorney then undertook to clear up the matter. It may be that he could have moved with somewhat greater dispatch at that point. But we are not disposed to regard that circumstance as a justifiable barrier to relief.

Under all the circumstances, in our judgment the equities strongly favored defendants, and provide an adequate basis under the broad scope of *R. R.* 4:62–2(f) for the trial court's order vacating the default judgment. Accordingly the judgment of the Appellate Division is reversed, and the order of the trial court is reinstated and affirmed.

Since the action on which the suit is based was barred long ago by the one-year limitation prescribed by *L.* 1942, *Chapter* 172, now *N. J. S.* 2A:50–8, the matter is remanded to the trial court for the entry of judgment for the defendants.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance* — None.