892 A.2d 646

HIGHLAND LAKES COUNTRY CLUB & COMMUNITY ASSOCIATION, PLAINTIFF–APPELLANT, v. ROBERT FRANZINO, DEFENDANT–RESPONDENT.

Argued September 12, 2005—Decided March 6, 2006.

*William M. Cox,* argued the cause for appellant (*Judith A. Heim* and *Dolan and Dolan,* attorneys; *Donald M. Ross,* of counsel; *Mr. Cox, Mr. Ross, Eileen McCarthy Born, Nancy Heslin Reading* and *Timothy M. Brody,* on the briefs).

*William F. Johnson, Jr.,* argued the cause for respondent (*Johnson, Murphy, Hubner, McKeon, Wubbenhorst, Bucco & Appelt,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

In this matter, a homeowners' association in a common-interest community seeks to compel a current homeowner to pay his unpaid membership fees, dues, and common assessments as well as arrears attributable to prior owners of the property. The homeowners' association contends that recorded covenants in the community's deeds and bylaws provided homeowners with notice that they would be responsible for arrears from prior owners and that their property would be encumbered by an equitable servitude for those arrears.

The homeowner argues to the contrary. He claims the covenant language did not provide him with sufficient notice that he was responsible for arrears from predecessors in title or that his property was conveyed subject to an equitable servitude in respect of arrears accrued by prior owners. Moreover, because there had been a recent mortgage foreclosure to which the Association had been a party, he argues that the foreclosure cleared the title of any lien for arrears that the Association may have had up to that point in time.

The Appellate Division, in an unpublished opinion, acknowledged that execution of a deed containing covenants compelling compliance with bylaw requirements can create an agreement to pay common fees and assessments (including arrears from prior owners), and also can give rise to a valid claim on property enforceable against a subsequent property owner. Here, however, the panel found that the terms of the recorded covenants were ambiguous and did not provide fair notice that property purchased in this community would be conveyed subject to a contractual requirement that the arrears of prior owners were enforceable against subsequent owners or that there would be an enforceable servitude on the property for those arrears.

We granted the Association's petition for certification, *Highland Lakes Country Club v. Franzino*, 183 *N.J.* 213, 871 *A.*2d 91 (2005), and now reverse the judgment of the Appellate Division.

## I.

### A.

Highland Lakes Country Club and Community Association (the Association) is a private, single-family, residential community governed by a not-for-profit corporation. Restrictive membership covenants contained in the community's master deed, in subsequent deeds used in the transfer of title to property, and in the Association's Bylaws require all property owners in the community to join the Association.[1] There appears to be no dispute that membership covenants are valid and enforceable and run with the land, binding all owners of property within a community. *Paulinskill Lake Ass'n, v. Emmich*, 165 *N.J.Super.* 43, 45, 397 *A.2d* 698 (App.Div.1978). At issue is the Association's position that, based on deed language requiring adherence to Bylaw requirements, arrears on membership charges that were accrued by predecessors in title may be enforced both as a contractual obligation undertaken by an acquiring property owner and as an equitable servitude on the property. We thus turn to the relevant language in the Bylaws that, coupled with the deed covenants, is asserted to provide notice that a purchaser in this community acquires the property with a concomitant obligation to pay arrears accrued by prior owners and that the property may be subject to an equitable servitude for such arrears.

Article III of the Bylaws includes the following provisions:

SECTION VIII.   Membership privileges in the Club will not be granted on resale or other transfer of ownership of property until all Club dues, assessments and initiation fees in arrears are paid in full.  (Amended 8/15/93)

---

[1] In a Master Deed recorded in 1936, and in the form of deed thereafter used to convey property in the community, there are two membership covenants. In covenants (s) and (t), the purchaser acknowledges that membership in the Association is required of homeowners, affirms that membership has been applied for, and agrees to abide by the Association's requirements, stating specifically that "the buyer further agrees to comply with and conform to the By–Laws of such association."

SECTION IX. Membership in the Club shall be granted automatically to new owners upon proof of conveyance of title to property in Highland Lakes satisfactory to the Membership Committee. The effective date of the membership of such new owners shall coincide with the effective date of the acquisition of title by such new owners, and such membership shall continue for the entire duration of ownership. Such new owners shall complete a membership data form and file the same with the Club at the time proof of conveyance of title is presented but any failure or delay in presenting such proof of conveyance of title or filing such membership data form shall not be deemed to relieve such new owners from the obligation of paying Club dues, assessments and initiation fees from the time the same shall have become due. (Amended 8/18/85)

SECTION X. All members shall comply with the By-Laws and Rules and Regulations of Highland Lakes Country Club and Community Association. (Amended 8/16/81)

SECTION XI. (Adopted 8/18/85) The Club shall have a lien on the real property in Highland Lakes of a member for all of such member's unpaid dues, assessments and initiation fees, together with the late payment charges thereon and reasonable attorney's fees for the collection thereof, which lien shall be effective and may be foreclosed in the following manner:

A. Such lien shall be effective from and after the time of recording in the office of the Clerk of Sussex County of a claim of lien stating the description of the property, the name and address of the record owner, the amount due and the date when due. Such claim of lien shall include only sums which are due and payable when the claim of lien is recorded and shall be signed and verified by an Officer of the Club. Upon full payment of all sums secured by the lien, the party making payment shall be entitled to a recordable satisfaction of lien. (Amended 8/15/93)

B. Liens for unpaid dues, assessments and initiation fees may be foreclosed by suit brought in the name of the Club in the same manner as a foreclosure of mortgage on real property.

C. Any suit brought by the Club to recover a money judgment for unpaid dues, assessments and initiation fees shall not be construed as a waiver on its part of the lien securing the same.

## B.

The history of this litigation, culminating in the present claim for arrears filed against homeowner, Robert Franzino, may be summarized as follows. On June 22, 1972, Gregory and Marilyn Donchevich purchased the Highland Lakes home that is the subject of this appeal. The Doncheviches gave a purchase money mortgage to Forman Mortgage Company. Through a series of assignments, Oxford Financial Companies (Oxford) came to hold the mortgage on the property. On December 12, 1990, Oxford

filed a complaint in foreclosure against the Doncheviches. The Association was joined as a party because it had a docketed judgment for arrears owed by the Doncheviches (Docket No. J–93072–89, entered in Superior Court of New Jersey on November 14, 1989 in the amount of 6,374.83, plus fees and costs). In Oxford's prayers for relief it sought a judgment barring and foreclosing all defendants of all equity or redemption in and to the property.[2] The Association asserted in a counterclaim that it had a lien on the property by virtue of the docketed judgment against the Doncheviches and because the recorded deed and Bylaws placed all persons owning property in the community on constructive notice that arrears would constitute an equitable servitude on their property. Moreover, the Association asserted that its recorded covenants had priority over the purchase money mortgage.

While Oxford's foreclosure action was pending, the Association was a party to another action before the Appellate Division that also involved whether the Association's assertion of a lien for arrears based on its covenant language would have priority over a purchase money mortgage on a home within the community. *Fortune Sav. Bank v. Von Glahn*, No. A–2310–90 (App.Div. Oct. 25, 1991). In respect of the issue of priority of payment, Oxford and the Association consented to be bound in their action by the

---

2 The broad statutory framework set forth in *N.J.S.A.* 2A:50–1 to –68, establishes the basis for foreclosure of mortgages. The scheme is designed to encourage participation by all with a recorded or recordable interest in the property because of the public interest in, and concern for, the perfecting of title at foreclosure. *See Marcy v. Larkin*, 99 *N.J. Eq.* 429, 430, 132 *A.* 90 (E. & A.1926). Foreclosure cuts off the rights of all named defendants, as well as holders of unrecorded lien claims, by barring and foreclosing all defendants of all equity or redemption in and to the lands. *See N.J.S.A.* 2A:50–30 (stating that, "so far as such property is concerned," "[an] action for the foreclosure of a mortgage" binds "all persons claiming an interest in or an encumbrance or lien upon such property, by or through any . . . lien or any instrument which, by any provision of law, could be recorded" even if not recorded); *R.* 4:64–1 and –5. Thus, just as Oxford had to name and serve the Association as a party to the action in order to obtain clear title to the property through the foreclosure proceeding, the Association's interest in the property necessitated its participation in the foreclosure to protect its claim.

decision in the *Fortune* appeal. In pertinent part, the Consent Order set forth how a holding in either's favor would affect the parties' positions on the priority of payment in the Oxford foreclosure action.

> In the event that a final decision is rendered in the Appeal before a Sheriff's sale of the mortgaged premises takes place in this action then, following the entry of such final decision, the Defendant CLUB shall file a Notice of Motion with the Court in this action for an Order determining the manner in which the proceeds of the sale shall be distributed and the Order of Distribution shall be consistent with the final decision rendered in the Appeal. In this regard:
>
> A. If the Court in this action determines that the final decision rendered in the Appeal on the priority issue is favorable to the Defendant CLUB, then the amount due the Defendant CLUB on the Cross–Claim filed by it in this action shall be paid to it from the proceeds of the sale and the amount due the Plaintiff on its mortgage shall be paid to the Plaintiff from and only to the extent that there is a surplus remaining after payment is first made to the Defendant CLUB.
>
> B. However, [i]f the Court in this action determines that the final decision rendered in the Appeal on the priority issue is unfavorable to the Defendant CLUB, then the amount due the Plaintiff on its mortgage shall be paid to it from the proceeds of the sale and the amount due the Defendant CLUB on the Cross–Claim filed by it in this action shall be paid to the Defendant CLUB from and only to the extent that there is a surplus remaining after payment is first made to the Plaintiff.

The Appellate Division decided the *Fortune* appeal in October, 1991, in favor of the purchase money mortgage holder, granting it priority in payment over the Association's asserted lien. Thereafter, a final judgment was entered in Oxford's favor in its foreclosure action. In ordering the sale of the Doncheviches' property to pay Oxford, the court also ordered that the defendant Association was "absolutely debarred and foreclosed of and from all equity of redemption of, in, and to said property when sold." In October, 1992, consistent with the court's order, a sheriff's sale was conducted and Oxford purchased the Doncheviches' property for $100.00. The Writ of Execution authorized a sale of the property to pay, in the first place, $54,228.31 to Oxford on its mortgage, together with interest on the principal sum in default on the mortgage. The trial court deleted language from the Writ that would have authorized payment, in the second place, to the Association. There is no record of there being a surplus from the

foreclosure after payment on the purchase money mortgage or that the Association ever made application for surplus monies. *See N.J.S.A.* 2A:50–37 (authorizing junior lien holders to pursue their right to surplus funds generated from foreclosure following satisfaction of first mortgagee); *R.* 4:64–3 (establishing procedures for petitions for surplus moneys).

The property was deeded to Oxford on June 1, 1993. On October 1, 1993, Oxford received a letter from Highland demanding payment in the amount of $851.66 for fees, dues, and assessments that had accrued on the property since the date that Oxford took ownership of the property. In addition, the Association demanded payment for the fees, dues, and assessments still owing from the Doncheviches. The letter advised that neither Oxford nor any subsequent purchaser would be allowed any of the privileges of membership until all arrears were paid. Oxford never paid any assessments on the property.[3]

On March 18, 1994, Franzino purchased the property from Oxford for $64,948.00. Franzino states that at the time of the sale he was unaware of any recorded lien on the property,[4] and he claims to have been unaware generally of the Association's position that he would be responsible for arrears due from prior owners. The Association takes issue with Franzino's latter assertion because of information contained in closing documents provided by Franzino's title insurer. We note that none of those documents were presented to the courts below.

---

[3] Oxford filed for bankruptcy protection, causing the Association to file with the bankruptcy court a protective claim for the arrears demanded from Oxford.

[4] As noted earlier, the Association obtained a docketed judgment for arrears against the Doncheviches, which lien provided the original basis for the Association having been named as a defendant in Oxford's foreclosure action. *R.* 4:64–1 and –5. The record reveals no evidence of entry of a satisfaction of that judgment. *R.* 4:48–1 and –2. To the contrary, the Association's original and amended Demand for Damages against Franzino references an amount remaining due on that judgment.

Franzino moved into the property, forwarding to the Association payment for his initiation fee as well as his first year's dues. The Association deposited the monies and informed Franzino that it applied his payment to the amounts owed by Oxford and the Doncheviches from their periods of ownership. The Association also advised Franzino that he would not be permitted any membership privileges until all arrears were paid in full. Franzino refused on the basis that the arrears of past owners were not his responsibility. He has refused to pay his own assessments since then.

This action ensued. The Association's complaint, filed in Special Civil Part in Sussex County, alleged that Franzino owed $6,750.14 for past amounts due, plus interest and the costs of suit. Franzino filed a motion to transfer to the Law Division, which was granted, and he filed a counterclaim that included two counts. He sought a declaratory judgment on his responsibility for the arrears of prior owners of his property, and he requested compensatory and punitive damages attributable to the Association's denial of membership privileges until those arrears were paid in full.

On cross motions for summary judgment, the trial court granted summary judgment to the Association and dismissed Franzino's counterclaims. Damages totaling $13,555.64 were awarded to the Association. Franzino was held liable for those arrears that were attributable to his period of ownership of the property, and for the arrears attributable to the Doncheviches and Oxford when they held the property. The trial court stated that although the Appellate Division's unpublished decision in *Fortune* established that a purchase money mortgage had priority over the Association's covenant lien in respect of the order of payment from monies available from the foreclosure and sale of the property, the foreclosure action did not extinguish Highland's contractual right to collect the assessments of prior owners from the current owner of the property.

Franzino appealed the judgment in respect of the arrears of Oxford and the Doncheviches. In an unpublished decision, the Appellate Division reversed. The panel explained that

[b]ecause a homeowner's responsibility to pay Highland's fees is based on restrictive membership covenants included in Highland's deeds and bylaws, because the bylaws specifically state that unpaid assessments are a lien "effective from and after the date of recording," and because no such lien was recorded when Franzino purchased [the property], we reverse.

The Appellate Division also stated that although the Association's deeds include membership covenants that are "real, run with the land and bind all members of the Highlands Community to pay dues, assessments and fees that accrue during ownership," the language of the covenants did not provide sufficient notice of an obligation to pay dues, fees, and assessments owed by prior owners. The court entered summary judgment in favor of Franzino on his counterclaim for a declaratory judgment and remanded Franzino's reinstated damages count.

## II.

### A.

Generally stated, homeowner association developments combine a "fee simple form of ownership with an automatic homeowners association" as follows:

[T]he defined space which is to be exclusive to a particular owner is located on a separate, subdivided lot, and legal title to the individual lots and improvements on each vests exclusively in the owner of each such lot. Open space, recreation and other common facilities are located on other lots, title to which is vested in a non-profit homeowners association which holds such title for the benefit of its members. A recorded declaration of covenants and restrictions establishes that the owner of each individual lot automatically acquires membership in the association upon acquisition of title to his lot.

[Wendell A. Smith, et. al., *New Jersey Condominium & Community Association Law* 5 (Gann 5)].

Lacking any statutory origin, homeowners' associations are created in New Jersey by the filing of a declaration of covenants, conditions, and restrictions contained in deeds and association bylaws. E. Richard Kennedy & Mark D. Imbriani, *The Rights of Tenants in Condominium and Homeowner Association Communities*, 174 *N.J. Law.* 18, 18 (1996). The covenants include restrictions and conditions that run with the land and bind all current and future property owners. Gemma Giantomasi,

Note, *A Balancing Act: The Foreclosure Power of Homeowners'
Associations*, 72 *Fordham L. Rev.* 2503, 2508 (2004). The bylaws
set forth the rules and regulations that govern an association's
members. *Id.* at 2507. Because such documents are instruments
affecting title to real estate, homeowners' associations may record
their governing documents. *See N.J.S.A.* 46:16–1 and –2. Once
recorded, the recordation can serve as notice to subsequent judg-
ment creditors and purchasers. *See N.J.S.A.* 46:21–1. It is well
established that membership obligations requiring homeowners in
a community to join an association and to pay a fair share toward
community maintenance are enforceable as contractual obligations.
*See Paulinskill Lake Ass'n, supra,* 165 *N.J.Super.* at 45, 397 *A.2d*
698. Moreover, such recorded covenants also can create a lien on
the property. *See Leisuretowne Ass'n, Inc. v. McCarthy,* 193
*N.J.Super.* 494, 501, 475 *A.2d* 62 (App.Div.1984) (affirming foreclo-
sure on lien arising from defendants' nonpayment of monthly
maintenance fees required by recorded covenants).

## B.

Of the three types of recognizable special rights encum-
bering or chargeable to property, to wit, common law liens,
equitable liens, and statutory liens, *see J.T. Evans Co. v. Fanelli,*
59 *N.J.Super.* 19, 22, 157 *A.2d* 36 (Law Div.1959), homeowners'
association liens are classified as equitable liens because they are
created by the covenants contained in members' deeds. *First
Fed. Sav. & Loan Ass'n v. Bailey,* 316 *S.C.* 350, 450 *S.E.2d* 77, 80
(Ct.App.1994); *see also* 51 *Am Jur.2d. Liens* § 30 (2004) (defining
equitable lien as "a right of a special nature over a thing, which
constitutes a charge or encumbrance upon it."). An equitable lien
constitutes a special right that is a combination of a legally
cognizable debt and a binding agreement to subject property to
the payment of that claim. *See Sisco v. New Jersey Bank,* 151
*N.J.Super.* 363, 369, 376 *A.2d* 1287 (Law Div.1977), *aff'd in part,
rev'd in part* 158 *N.J.Super.* 111, 385 *A.2d* 890 (App.Div.1978).
Stated otherwise, "[f]or an equitable lien to arise there must be a

debt owing from one person to another, specific property to which the debt attaches, and an intent, expressed or implied, that the property will serve as security for the payment of the debt." *Bailey, supra,* 450 *S.E.*2d at 80–81 (citation omitted).

For a covenant to create such a lien right in a homeowners' association, a property owner must have adequate notice. Because the covenant, if enforced, would affect the use and enjoyment of the land, covenant language must be construed strictly, and in favor of the owner's unrestricted use. *Hammett v. Rosensohn,* 46 *N.J.Super.* 527, 535, 135 *A.*2d 6 (App.Div.1957), *aff'd,* 26 *N.J.* 415, 140 *A.*2d 377 (1958). Clarity of language also is essential for another reason. Subsequent bona fide purchasers of property encumbered with an equitable lien take "subject to the rights of the equitable lienor," provided there is notice of the lien. 51 *Am Jur.*2d *Liens* § 18 (2000). *See, e.g., Rittenhouse Park Cmty. Ass'n v. Katznelson,* 223 *N.J.Super.* 595, 597–99, 539 *A.*2d 334 (Ch.Div.1987) (affirming foreclosure for nonpayment of arrears from predecessor in title based on notice of property's encumbrance provided in recorded covenants).

### III.

#### A.

In this matter, the Association seeks to hold Franzino liable for arrears for common assessments on the property that arose during the period of the property's ownership by the Doncheviches, the period of ownership by Oxford, and the period during which he owned the property. We begin with the Association's claim that Franzino purchased the property with a preexisting lien created when the Doncheviches went into arrears on their common assessments.

Assuming for the moment that the covenant and Bylaw language created a lien on the property (apart from the docketed judgment against the Doncheviches) when the Doncheviches went into arrears on the Association's common charges, that lien would

not have survived after Oxford foreclosed on the property naming the Association as a defendant in that foreclosure action. As noted *infra*, at p. 105–06 n. 2, 892 *A.*2d at 649–50 n. 2, mortgage foreclosure actions are designed to bring together for one disposition creditors' claims to the property. To obtain a foreclosure, "a plaintiff commences suit by joining the mortgagor, all subsequent mortgagees, and all subordinate judgment creditors as defendants in the action." *New Brunswick Sav. Bank v. Markouski*, 123 *N.J.* 402, 420, 587 *A.*2d 1265 (1991). All subsequent mortgages and encumbrances are brought into court "in order that their rights might be established, disposed of by decree and their liens transferred from the property to the proceeds of sale." *Norfolk Bldg. & Loan Ass'n v. Stern*, 113 *N.J.Eq.* 385, 387, 167 *A.* 32 (Ch.1933). The property, however, is freed of the lien, enabling the purchaser at foreclosure sale to take title unencumbered by the lien. *Id.* at 388, 167 *A.* 32. Stated otherwise, the lien is discharged as to the property.

Here, any lien that may have been created when the Doncheviches went into arrears on Association common assessments was extinguished by operation of the foreclosure judgment and subsequent sheriff's sale. We reject the Association's argument that liens created through operation of its covenants and bylaws language are entitled to survive a foreclosure judgment. The Association's position is contrary to foreclosure's essential purpose of transferring a lien claim from the property to the monies generated by the foreclosure sale, thus clearing title to the property.[5] Accordingly, we hold that the Association's asserted lien for the Doncheviches' arrears, arising from the covenant language in the Doncheviches' deed and governing Bylaws, was extinguished by operation of the foreclosure judgment and sale. The property was no longer encumbered by that lien. That said,

---

[5] Of course, the Association may pursue the Doncheviches personally on the debt owed. However, foreclosure is a *quasi in rem* action and, therefore, after the lien is extinguished by operation of the foreclosure judgment, the property no longer secures the debt.

although that lien became unenforceable, the underlying debt that gave rise to that lien was not affected.

It has long been the law in New Jersey that extinguishment of a lien does not affect the validity of the underlying debt that gave rise to the lien. *See Court Inv. Co. v. Perillo,* 48 *N.J.* 334, 225 *A.*2d 352 (1966) (holding recognizes that action by third mortgagee for debt underlying third mortgage was not barred by foreclosure action where first mortgagee acquired property under lien free and clear of third mortgage and where proceeds of foreclosure sale were insufficient to pay third mortgage debt); *Vreeland Bldg. Co. v. Knickerbocker Sugar Refining Co.,* 75 *N.J.L.* 551, 554–55, 68 *A.* 215 (E. & A.1907) ("There is nothing occult or mysterious about an action upon a . . . lien claim. So far as the . . . party contracting the debt is concerned, it is an ordinary action *in personam.* Combined with it, however, is an action *quasi in rem* to establish and enforce a lien upon certain defined interests in the building and land in question." (citations omitted)). On that basis, the Association urges that the debt underlying the lien filed against the prior owners of the property remained unsatisfied and, by operation of the master deed and Bylaws, was assumed by Franzino when he acquired the property to which that debt referred. The Association urges that Franzino's purchase of the property, subject to the deed and Bylaw covenants, created new contractual agreements binding him to pay both his common assessments on the property and those arrears that were accrued by his predecessors in title. The covenant language thus created a debt, for present and past arrears, and also created anew a special remedy for that debt in respect of the property—an equitable servitude on the property to secure Franzino's payment of those debts.

As to whether the covenant language is sufficiently specific to impose a new debt obligation for the arrears of past owners, we turn to the language itself to see whether it expresses such intent with sufficient clarity to provide fair notice of the obligation alleged.

## B.

██ Article III, Section VIII of the Bylaws, states that *"[m]embership privileges* in the Club will not be granted on resale or other transfer of ownership of property until all Club dues, assessments and initiation fees in arrears are paid in full." (emphasis added). Although Section VIII does not include specific reference to arrears "accrued by predecessors in title," its import plainly conveys the message that "all arrears" means "all." It informs a new owner that until all arrears are satisfied the privilege of association membership will be withheld. It is, in essence, notice that privilege denial will be used as leverage to compel satisfaction of all arrears.

Section IX, which speaks to actual "membership" in the Association as opposed to addressing the privileges of membership, addresses a new owner's obligation and states that the new owner's duty to pay dues and common assessments commences with the date from which membership is recognized, namely the date of conveyance. Section IX envisions the possibility of a gap between the date a purchaser acquires a property subject to the Association's Bylaws and the date that the purchaser actually pays his initiation dues and fees. However, that obligation—the liability for one's own "dues, assessments and initiation fees"—does not define Section VIII's obligation on a resale purchaser to become liable for any "arrears." If that construction were correct, then Sections VIII and IX of Article III of the Association's Bylaws would be duplicative and, hence, unnecessary.

██ Our obligation when interpreting contractual provisions is clear. First and foremost, "fundamental canons of contract construction require that we examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *State Troopers Fraternal Ass'n v. New Jersey,* 149 *N.J.* 38, 47, 692 *A.*2d 519 (1997) (citations omitted). As stated in *Marchak v. Claridge Commons, Inc.,* "[w]hen reading a contract, our goal is to discover the intention of the parties. Generally, we consider the contractual

terms, the surrounding circumstances, and the purpose of the contract." 134 *N.J.* 275, 282, 633 *A.2d* 531 (1993) (citations omitted).

The application of those canons of contract construction requires that we give Sections VIII and IX the temporal application that a fair reading of those provisions demands. Viewed in its proper context, Section VIII applies to a "resale or other transfer of ownership of property" and makes clear that, in those circumstances, membership privileges in the Association will not be available to the purchaser until all "dues, assessments and initiation fees *in arrears* are paid in full." (emphasis added). Common sense tells us that at "resale or other transfer of ownership of property" there are and there can be no "dues, assessments and initiation fees in arrears" other than those already due from prior owners. Thus, Section VIII undoubtedly addresses those "dues, assessments and initiation fees" that are "in arrears" at the time of a "resale or other transfer of ownership of property" and imposes the obligation of their satisfaction on the new owner of the property.

Section IX of Article III of the Association's Bylaws picks up where Section VIII leaves off. It addresses those instances when a subsequent acquirer of a property subject to the Association's Bylaws delays paying his own required "dues, assessments and initiation fees," thereby creating a gap between the acquisition of the property (and the concomitant and contemporaneous obligation to pay for membership in the Association) and the date the new property owner actually pays for his membership in the Association. Outlining the process by which a "new owner" must become a member of the Association, Section IX fills that gap:

> Membership in the Club shall be granted automatically to new owners upon proof of conveyance of title to property in Highland Lakes satisfactory to the Membership Committee. The effective date of the membership of such new owners shall coincide with the effective date of the acquisition of title by such new owners, and such membership shall continue for the entire duration of ownership. Such new owners shall complete a membership data form and file the same with the Club at the time proof of conveyance of title is presented but any failure or delay in presenting such proof of conveyance of title or filing such membership data form

shall not be deemed to relieve such new owners from the obligation of paying Club dues, assessments and initiation fees from the time the same shall have become due.

Placed in its rightful chronological sequence, Section IX requires first that any "new owners shall complete a membership data form." The new owner is then required to submit both the membership data form and "proof of conveyance of title to property in Highland Lakes satisfactory to the Membership Committee" of the Association. Once that process is completed, membership in the Association is "granted automatically." However, in order to avoid delays in the submission of the membership data form and proof of conveyance of title, Section IX denies the tardy new owner any benefit from his delay: "any failure or delay in presenting such proof of conveyance of title or filing such membership data form shall not be deemed to relieve such new owners from the obligation of paying Club dues, assessments and initiation fees from the time the same shall have become due." Thus, when properly read, Section IX simply serves as a gap-filler to avoid the non-payment of dues, assessments or initiation fees that may arise during any period a new owner delays in satisfying his membership obligations.

Read as written, and in context, Sections VIII and IX of Article III of the Association's Bylaws are not ambiguous. Therefore, nothing here should be read to relieve Franzino of the obligation to which he became bound under the master deed and Bylaws when he acquired the property: the obligation to inquire about and to ensure satisfaction of all "dues, assessments and initiation fees *in arrears*," a conclusion further supported by the plain meaning of the term. There can be no ambiguity concerning the term "arrears;" it is universally defined as "[a]n unpaid and overdue debt or unfulfilled obligation" or, more generally, "[t]he state of being behind in fulfilling contracted obligations or payments." Webster's II New College Dictionary 62 (1995). *See also* Black's Law Dictionary 104 (7th ed. 1999)(defining "arrears" as "[t]he state of being behind in the payment of a debt or the discharge of an obligation" or "[a]n unpaid or overdue debt" or

"[a]n unfinished duty"); Webster's Third New International Dictionary of the English Language Unabridged 121 (1981)(providing similar definition); Webster's II New College Dictionary 62 (1995)(same). The phrase "in arrears," has been elsewhere defined as "owing money that should have been paid in the past." Cambridge Advanced Learner's Dictionary (2006), *http://dictionary. cambridge.org/define.asp?key=4068&dict-CALD*. Thus, on acquisition, a purchaser of property governed by the Association is obliged under Section VIII to pay money that should have been paid in the past, and it stands to reason that the amounts include the arrears accrued by any prior owner. In contrast, all Section IX does is close a possible loophole by continuing that obligation on the new owner for whatever arrears the new owner himself accrues from the date of his acquisition of the property until he completes the membership process.

## C.

For completeness, we add the following in respect of any ambiguity alleged to arise based on the inclusion of Section XI in Article III. That section merely recites that the Association "shall have a lien on the real property in Highland Lakes of a member for all of such member's unpaid dues, assessments and initiation fees, together with the late payment charges thereon and reasonable attorney's fees for the collection thereof," and then further provides the mechanism for the recordation of that lien by stating the obvious; "[s]uch lien shall be effective from and after the time of recording . . . ." Because of that language, Franzino claims refuge in the absence of any arrears lien filed by the Association, arguing essentially that Section XI invites prospective purchasers to search for a filed lien that would inform a purchaser of the exact amount of an encumbrance on property and would enable a purchaser to fulfill a duty to inquire.

That analysis incorrectly fuses the procedural step of recording a lien with the substantive right to collect on an underlying debt, which is valid without regard to the recordation of a lien. Nothing

in the Bylaws requires that the Association record a lien as a condition precedent to the validity of the underlying debt. Therefore, the failure to record a lien cannot be transformed into a failure of notice. Read sensibly, Section XI accomplishes two purposes: it grants the Association the substantive right to record a lien for arrears, and it makes clear that the lien—*not* the underlying debt—"shall be effective from and after the time of recording. . . ." Any notice a prospective purchaser needs of his obligation in respect of arrears accrued by his predecessors in title is provided amply in Section VIII, which bars membership in the Association "until *all* Club dues, assessments and initiation fees *in arrears* are paid in full." (emphasis supplied). Section XI creates no safe harbor for a less-than-diligent prospective purchaser. On the contrary, Section XI provides the Association the means to enforce its contract rights by recording a lien; it has no effect on the parties' substantive rights and obligations.

## D.

We conclude that there was a debt owed to the Association by Franzino's predecessors in title relating to the property that preceded Franzino's acquisition. Franzino acquired the obligation to pay for that debt when he acquired the property without requiring satisfaction of the arrears debt prior to closing title. Accordingly, we uphold the continuing validity of the underlying debts owed to the Association and separately incurred by defendant Franzino and his predecessors in title Gregory and Marylyn Donchevich and Oxford Financial Companies, and hold further that any liens in favor of the Association applicable to the property were either extinguished or never perfected.

The master deed and Bylaw provisions certainly put Franzino on notice that he had an obligation to inquire about amounts owing on his property because all amounts would have to be paid for him to enjoy the privileges of membership.[6] Had he done so at or

---

[6] We note that identifying "arrears" in Section VIII as including arrears caused by predecessors in title would improve the specificity of notice.

prior to closing, he would have discovered those categories of charges that were owing, and their amounts.[7] Thus, he could have opted out of the purchase, secured payment of the arrears as a charge against the seller at closing, or caused the escrow of funds sufficient to cover the arrears. Franzino failed to take any of those simple precautions and is therefore liable for both the preexisting debt on the property as well as the arrears that accrued after he acquired the property. In sum, his failure to make inquiry does not relieve him of his membership requirements under the master deed and Bylaws. In the end, the proper course here is the one adopted by the trial court below, which cited with approval most of the following excerpt from the unpublished trial court decision ultimately concluding the *Fortune* matter:

> What was the consequential effect on the By–Laws resulting from entry of the final judgment of foreclosure? None in my opinion. The By–Laws retained their vitality after the judgment. The By–Laws continue to bind all property owners in the Highland Lakes community, including anyone who purchases the foreclosed property.... The By–Laws became binding upon [Franzino] when [he] became a property owner in Highland Lakes. The foreclosure purchaser [and its successors] take[ ] subject to all equities, liens or other similar interests which existed against the mortgaged land prior to the execution of the foreclosed mortgage. *See, e.g., Hartshorne v. Hartshorne,* 2 *N.J.Eq.* 349, 356 (Ch.1840); *Locustwood Land Co. v. Locustwood Cemetery Ass'n,* 147 *Atl.* 628 (E. & A.1929). An equitable servitude, such as the membership covenants at issue here, is not destroyed by the foreclosure judgment. [Franzino] was chargeable with knowledge of, and is bound by, the membership covenants by virtue of [his] actual knowledge acquired during this litigation and by constructive knowledge of recorded documents which are in [Franzino's] chain of title.

Based on that logic, the trial court below found in favor of the Association and held that

> [t]he present facts are nearly identical to *Fortune.* Here, Oxford purchased the property at a sheriff's foreclosure sale and then sold it to Franzino. Just as [the *Fortune* court] found Fortune liable to Highland for the Van Glahn's dues, so too is Oxford liable to Highland for the Donchevich's dues.
>
> The only wrinkle is the fact that Oxford is now bankrupt. However, this in no way releases Franzino as a subsequent purchaser from paying the Donchevich's dues, as they are a servitude "running with the land."

---

[7] That information readily could have been obtained by the expedient of a simple telephone call to the Association.

Both the trial court in *Fortune* and the trial court below were correct in their conclusions. In sum, we do not find ambiguity in the Bylaws. Franzino assumed the liability for the arrears accrued by his predecessors in title when he acquired the property subject to the covenant conditions.

## IV.

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

Justice WALLACE, dissenting.

I respectfully dissent. I concur with the Appellate Division decision that the Association's Bylaws are ambiguous.

The majority opinion states that despite the lack of a "specific reference," Article III, Section VIII "plainly conveys" that a new owner is liable for arrears accrued by his or her predecessors in title. *Ante* at 115, 892 *A*.2d at 655. Although the majority asserts that the provisions are not ambiguous, it relies on "common sense" and a "fair reading" of the provisions "viewed in [their] proper context" to find that Section VIII "undoubtedly addresses" the past-due fees owed by prior owners and "makes clear" that a new owner must pay those fees to become a member of the Association. *Ante* at 116, 892 *A*.2d at 656.

In my view, the provision in Section VIII of the Bylaws that withholds membership privileges "on resale or other transfer of ownership of property until all Club dues, assessments and initiation fees in arrears are paid in full" does not give clear notice to a new owner that he or she must pay the arrears of a previous owner.

Article III, Section IX provides:

Membership in the Club shall be granted automatically to new owners upon proof of conveyance of title to property in Highland Lakes satisfactory to the Membership Committee. The effective date of the membership of such new owners shall coincide with the effective date of the acquisition of title by such new owners, and such membership shall continue for the entire duration of ownership. Such new

owners shall complete a membership data form and file the same with the Club at the time proof of conveyance of title is presented but any failure or delay in presenting such proof of conveyance of title or filing such membership data form shall not be deemed to relieve such new owners from the obligation of paying Club dues, assessments and initiation fees from the time the same shall have become due.

I am in accord with the Appellate Division's conclusion that the word "arrears" in Section VIII

is just as easily and reasonably read to refer only to the "arrears" any new owner would expect to incur, pursuant to Section [IX], between the effective date of his or her membership, which is the date of the acquisition of title, and the date the new owner files the membership data and proof of conveyance of title.

Beyond that, the Bylaws suggest that an acquiring property owner may rely on the typical notice provided through a recorded lien search on the property. Article III, Section XI specifically states that the Association will have a lien on the property within the community for unpaid arrears, which will be effective "from and after the time of recording ... of a claim of lien stating the description of the property, the name and address of the record owner, the amount due and the date when due." The plain import of that provision invites prospective purchasers to search for a filed lien that would inform a purchaser of any encumbrance on the property.

"Generally, the terms of an agreement are to be given their plain and ordinary meaning." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 171 *N.J.* 378, 396, 794 *A.2d* 141 (2002) (citation omitted). But when "the terms of the [agreement] are susceptible to at least two reasonable alternative interpretations," the language is ambiguous. *Ibid.* (internal quotation and citation omitted). This Court has recognized that "[w]here an ambiguity appears in a written agreement, the writing is to be strictly construed against the draftsman."[1] *In re Estate of Miller*, 90 *N.J.* 210, 221, 447 *A.2d* 549 (1982) (citing *Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 18 *N.J.* 294, 302, 113 *A.2d* 787 (1955)). That principle is especially true where the

---

[1] The *Restatement* states the same: "In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally

parties to the contract do not have the same bargaining power. *See Bd. of Educ. v. Utica Mut. Ins. Co.,* 172 *N.J.* 300, 306–07, 798 *A.*2d 605 (2002).

Both Franzino and the Association posit reasonable alternative interpretations of the Bylaws. A contract is not clear if more than one interpretation is plausible. The Association drafted the Bylaws and presented them on a take-it-or-leave-it basis to all residents of the development. Consequently, I would construe the ambiguity in the Bylaws against the Association, the party that drafted the documents, and affirm the judgment of the Appellate Division.

*For reversal*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and RIVERA–SOTO—6.

*Dissenting*—Justice WALLACE—1.

---

preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." *Restatement (Second) of Contracts* § 206 (1981).