# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2281-18T2

L.L.,

    Plaintiff-Respondent,

v.

M.V.[1],

    Defendant-Appellant.

_____

Submitted May 18, 2020 – Decided August 12, 2020

Before Judges Rothstadt and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1788-14.

Shannon Garrahan, attorney for appellant.

Townsend, Tomaio & Newmark, LLC, attorneys for respondent (Kevin Wei-Kwan Ku, of counsel and on the brief; Daniel Pelic, on the brief).

_____

[1] We use initials to protect the parties' privacy interests. See R. 1:38-3(d)(10).

PER CURIAM

In this post-judgment dissolution matter, defendant M.V. appeals from the Family Part's December 21, 2018 order that the trial court entered after a plenary hearing regarding the parties' Property Settlement Agreement (PSA) as it related to the distribution of the parties' jointly owned real estate, and a subsequent separate agreement that addressed the sale of plaintiff L.L.'s business to defendant. On appeal, defendant argues that the court's determination was not supported by the evidence, its decision resulted in "a better agreement" for plaintiff than she bargained for, it erred by not awarding "defendant a retroactive increase in child support," or certain credits to which defendant was entitled, it impermissibly amended a final restraining order (FRO) between the parties, and it abused its discretion by awarding attorneys' fees to plaintiff and not to defendant. For the reasons that follow, we affirm in part, but remand two issues to the trial court relating to credits to which defendant was entitled and to the court's award of attorneys' fees.

The parties were married in 1992 and they had twins born in January 2001. During the marriage, the parties purchased two residential properties, the marital home in Ramsey and a two-family home in Hackensack as an investment property.

While still married, plaintiff purchased a landscaping company known as Anchor Landscaping and Anchor Property Management (Anchor), which she initially owned and operated by herself from the Ramsey property. In 2007, after plaintiff asked for defendant's assistance, defendant handled Anchor's field management and was the "[f]oreman for the business." In February 2014, plaintiff filed for divorce. A month later, without counsel, the parties signed a "Co-ownership Work Responsibility and Compensation Agreement . . . in the Joint Ownership of Anchor," in which plaintiff purportedly conveyed ownership of one half of Anchor to defendant.

Two months later, the parties entered into their PSA, also without counsel. The PSA provided for plaintiff to remain in the Ramsey property and defendant in the Hackensack property, with each agreeing to pay all expenses associated with the home they were living in. The PSA did not contain a provision regarding the transfer of title as to either property or anything about the ownership of Anchor. It did state that the parties agreed the equity in both properties had a value of $550,000. The PSA also referenced commercial trucks and trailers used by Anchor and stated that they would be jointly owned but title would be under Anchor's name.

3

The PSA also stated that each party would keep the vehicles that were under their control. The parties also "agree[d] to waive any rights that each may have" in each other's pension and retirement accounts. Moreover, it did not address alimony or child support. The PSA did provide for attorneys' fees and reasonable costs to be paid to the "prevailing party" if "a dispute [arose] regarding the enforcement of this agreement." On May 7, 2014, the court entered a default judgment of divorce (JOD) that incorporated the parties' PSA.

Later that month, and again without counsel, the parties entered into another agreement they called the "Sale of Anchor Property Management" agreement (Agreement), which was to supersede their March 2014 agreement. Through the Agreement, defendant promised to purchase Anchor from plaintiff for $115,500, which would be payable to plaintiff at the rate of $2000 per month over a fifty-five-month period. The Agreement also provided for defendant to continue to operate from the Ramsey property, but obligated him to pay plaintiff rent at the rate of $900 per month.

The Agreement also stated, among other things, that: Defendant would receive a credit of $4000 that would "be deducted from [the] end of [the] loan which represent[ed] the portion of the contracts that were paid in full at the start of the 2014 season"; and plaintiff was "guaranteed a minimum of [ten] hours [of

employment] . . . to be paid weekly at a rate of $20 per hour as long as [plaintiff] [held] the loan against the business. Time sheets [would] be submitted for each week's work to be paid in cash . . . in [plaintiff's] personal account." It further stated that all of Anchor's vehicles, equipment, and trailers would be transferred to defendant's name, and they would serve as collateral against the purchase payments so in the event that any of the business, income, or rent payments were not made, plaintiff could seize those assets and auction them off for payment.

The Agreement obligated plaintiff to train defendant for 120 hours, and, by May 30, 2014, to remove her name from the business bank account. All incomes that the business received for snow blowing rendered between 2013 and 2014 were to be shared equally between the parties, and any checks received after June 1, 2014, "that represent[ed the first] quarter billing of all business estimated and booked prior to June 1," would be shared with plaintiff receiving 15% of the payments. Any "business booked for snow in 2013 and 2014" and sums received from that would be payable to plaintiff. The Agreement also provided that plaintiff would "be released and held harmless for all . . . [of] Anchor['s] debt"; and that she would not solicit Anchor's customers.

The parties also agreed, as to other debts, that plaintiff would assume a certain Chase credit card debt. Additionally, that by May 30, 2014, defendant

would remove his name from their joint personal account and plaintiff would sell a 2005 Chevy truck to defendant for one dollar.

Thereafter, defendant made the first two payments towards Anchor's purchase that were due in June and July 2014 but stopped making payments beginning in August 2014. The parties then became embroiled in disputes over their agreements, which resulted in years of litigation.

In 2015, the parties filed cross complaints against each other under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, and obtained FROs against each other. The FRO against plaintiff barred her from both the Ramsey and Hackensack properties. That same FRO granted temporary custody of the children to defendant and granted plaintiff supervised visitation but made no provision for child support.

In December 2015, plaintiff filed a motion seeking, among other things, emergency financial relief in the form of alimony and an award of counsel fees and costs. The court denied the motion because there was no provision for such payment in the parties' PSA, and at the final hearing, plaintiff waived any claim for alimony.

Thereafter, plaintiff served a subpoena on defendant's bank, and defendant filed a motion seeking, among other things, to find plaintiff in violation of

litigant's rights for serving the subpoena and attempting to obtain defendant's confidential information. Plaintiff filed a cross-motion seeking a plenary hearing and requesting emergency financial assistance in the form of a lump sum equitable distribution payment.

After considering the parties' March 18, 2016 oral arguments, the court placed its findings on the record. The court found that plaintiff was in violation of litigant's rights by prematurely issuing the subpoena without prior court approval but rejected defendant's claim that the information sought could never be used in this case. It also denied defendant's request for sanctions. As to plaintiff's cross-motion, the court again denied plaintiff's claim for emergency financial assistance. However, it ordered a plenary hearing as to the equitable distribution of the parties' properties and Anchor.

Prior to the March 18 order, on March 15, 2016, defendant filed a motion for plaintiff to pay child support in accordance with the Child Support Guidelines. See Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A, www.gannlaw.com (2020) (Guidelines). In the motion, defendant also requested that he be allowed to purchase the Ramsey property or to allow him to sell the Ramsey property through a power of attorney on behalf of plaintiff, as plaintiff had not paid the mortgage since May 2015.

On May 27, 2016, the court considered the parties' oral arguments and then placed its decision on the record. The court denied without prejudice the request to sell the Ramsey property and ordered plaintiff to pay $20 per week in child support. In doing so, the court noted that the parties did not provide the financial information needed to determine child support, which made it difficult for it to make a decision and to understand how plaintiff's income was only $13,000 a year as she alleged. The court further noted that plaintiff received $140 a month from public assistance and $194 a month in food stamps. Based on that information, the court deviated from the Guidelines' award of $41 per week and, instead, awarded defendant $20 a week for child support because plaintiff was existing only on "a general assistance allotment of $140 a month."

In the meantime, the previously ordered plenary hearing was repeatedly adjourned for a variety of reasons. While it remained pending, on November 22, 2016, plaintiff served another subpoena on defendant's bank that resulted in defendant filing another motion arguing that the subpoena was impermissible without prior court approval. Plaintiff filed a cross-motion, requesting a denial of plaintiff's motion in its entirety and for counsel fees and costs. Oral argument was held on January 13, 2017, and the court again found the subpoena was

impermissible, but since the information was needed to value Anchor, the court did not quash the subpoena.

The plenary hearing finally commenced on July 5, 2017, and continued on nonconsecutive days, ending almost a year later on June 12, 2018.[2] At the beginning of the hearing, the court noted that the only issues to be considered related to equitable distribution of the Ramsey and Hackensack properties, distribution of Anchor, and counsel fees and costs. During the hearing, in addition to the parties, two certified public accountants testified about Anchor's value: Robert J. Zak for plaintiff, and Daniel Jordan for defendant. Zak testified that Anchors' value as of May 7, 2014 was $414,000, and Jordan testified it was $105,000 as of the same date.

Plaintiff testified for several days. Plaintiff described her nonexistent relationship with her children, her education, her employment prior to acquiring Anchor, her fiancé, and the difficulties and various illnesses she had, including difficulties with her pregnancy, diabetes, and several heart issues that prevented her from working. She also explained that she relied upon public assistance due

---

[2] While the hearing was well underway, plaintiff filed a motion seeking a $50,000 advance on equitable distribution, $10,000 towards her counsel fees and costs, and for the court to amend the FRO to remove the Ramsey property from places she was barred from. The motion was denied in its entirety on October 20, 2017.

A-2281-18T2

to her inability to work, defendant's failure to make the payments required by the Agreement, and her fiancé losing his job.

Plaintiff testified about the parties drafting the PSA using an online service and confirmed that she entered into the PSA voluntarily. She stated that it was the parties' intention to have her own the Ramsey property and receive all profits from rent for that property, while the same was to be true for defendant with the Hackensack property. According to plaintiff, the PSA mistakenly did not provide for the transfer of title between the parties.

As to the Ramsey property, plaintiff stated that she rented the property to a tenant since July 1, 2014, but in 2017 she had to seek to evict the tenant because of his nonpayment of rent. She also explained that after the Ramsey property was appraised, the parties stipulated that its value was $400,000.

Plaintiff also testified about her acquisition of Anchor and her asking for defendant's help with it in 2007, which resulted in Anchor's business expanding. At the time, while defendant worked for Anchor, he was not an owner of the business. According to plaintiff, in March 2014 she conveyed 50% of the business to defendant, as defendant "insisted on taking control [of the business] and taking [plaintiff's] name off all the bank accounts, and he was going to control all the money from then on," which prevented plaintiff from paying off

her debt and made her "penniless." The March 2014 agreement was only made to reassure defendant that plaintiff "would never financially let . . . anything happen to him." Afterward, since plaintiff did not have much money, she decided to move to Chicago with her fiancé but intended to come back to Ramsey before the children returned to school.

When the parties' relationship deteriorated, plaintiff told defendant that he should "buy [her] out" of the business, which led the parties to execute the superseding Agreement. After the Agreement was executed, defendant only made two payments, so plaintiff decided to stop working for Anchor. Prior to the alleged breach, plaintiff believed she was in compliance with the Agreement as she was preparing all the bills and estimates for Anchor. According to plaintiff, the Agreement was now "unfair," and the court should equitably distribute the business instead of following the Agreement's terms to prevent defendant from receiving a windfall.

Plaintiff admitted that in response to defendant failing to make payments, she took action to divert company funds to her by notifying Anchor's clients to send payments to her instead of defendant. Plaintiff testified that she took such an action because defendant did not "inventor[y] for the sale . . . of Anchor['s]" assets as provided in the Agreement. She also admitted receiving insurance

11

proceeds in the amount of $11,000 for damages to one of Anchor's trucks that was under her name, which she used to pay towards her counsel fees.

Since plaintiff believed that she was entitled to a larger portion through equitable distribution, she thought "it would only be fair that [she] take on" more of the Chase credit card debt. In relation to the approximately $160,000 I.R.S. debt, she wanted it to be split between the two. As to counsel fees, since defendant breached the Agreement, plaintiff believed that he should be responsible for her counsel fees.

Defendant testified next. He explained that the demise of the parties' relationship began when plaintiff started having an affair that eventually did not work out for her and led her to abuse alcohol and drugs. Defendant stated this contributed to her inability to care for their children, home, and business.

Defendant acknowledged that the parties had a verbal agreement to exchange quitclaim deeds to the Ramsey and Hackensack properties, but that was not in writing because plaintiff was in a rush to get to Chicago to be with her fiancé. However, he maintained that it was not his understanding that he "was . . . relinquishing [his] rights to [the] Ramsey [property]," and despite the PSA's terms, he believed the Ramsey property was valued a little higher than the Hackensack property.

Addressing the sale of Anchor to him, defendant indicated that the $111,500 purchase price included the $100,000 value for the business and $11,500 was half the amount of debt that was owed on the Chase credit card at the time. He confirmed he made the first two purchase payments but added that he only made a half payment in August, as the company truck was still under plaintiff's name and plaintiff stole Anchor's computer that contained its records and customer list from him. Defendant did not have any proof that he made a payment in August.

Defendant also stated that he paid rent for Anchor's office for the months of June and July. He stopped making rent payments because plaintiff complained to the town that commercial vehicles were not allowed at the Ramsey location, which prevented defendant from using the office at the Ramsey property. Plaintiff also failed to provide defendant with the 120 hours of training as promised by the Agreement. He stated that plaintiff did not give him some of the business's equipment and vehicles as promised. According to defendant, once he stopped making the monthly payments, plaintiff began to harass and threaten him, which caused defendant to apply for a restraining order, which was later granted. Defendant admitted that there was no reason why

plaintiff could not be at the Ramsey property, but he wanted plaintiff to file a motion under the FV docket to amend the FRO.

Around this time, defendant started having issues with receiving checks from clients. According to defendant, plaintiff "started . . . sending letters to [Anchor's] clients saying that she was going to repossess the business," and mail should be forwarded to her. Defendant stated that plaintiff's letters to the clients affected him "big time." At the time plaintiff contacted Anchor's clients, she was not working for the company. Several of the clients ended up filing criminal charges against plaintiff in relation to the letters, which were pending at the time of the plenary hearing. Defendant also filed an action in the Law Division seeking to prevent plaintiff from having contact with Anchor's customers, which was granted. Afterwards, plaintiff contacted the clients again.

As to their debts, defendant believed that plaintiff was obligated to pay for the Chase credit card, that the debt owed to the I.R.S. should be split equally, and that the Ramsey mortgage should be paid by plaintiff with defendant getting some of the equity from that property. Defendant also testified that because plaintiff failed to pay her automobile loan or mortgage payments for the Ramsey property, his credit score was negatively impacted as his name was still on both loans.

Defendant stated that he never purchased plaintiff's interest in Anchor as she failed "to surrender the trucks and the trailers" to him. Defendant confirmed that while he did not have all of Anchor's equipment, he still had all of his client's contact information. However, he had no information pertaining to invoices and amounts paid by those clients. Additionally, while plaintiff had one of the trucks that was used for the business, there was another truck defendant used for the business, which was acquired during the marriage. Further, while plaintiff was supposed to work remotely when she moved to Chicago, defendant stated that plaintiff never did because she was always intoxicated. Plaintiff further did not train defendant and she did not provide defendant with any "personal monies to . . . assist in payroll whenever [defendant was] short to pay the crew."

Defendant's proposal for Anchor was that he would continue to make monthly payments and have plaintiff "put the trucks and the trailers in his name." He also wanted a credit for payments previously made or advanced to plaintiff.

After the hearing concluded, both parties' counsel filed certifications for counsel fees and costs, setting forth the information required by Rule 4:42-9(b), Rule 5:3-5(c), and R.P.C. 1.5(a). Defendant's counsel stated that his hourly billable rate was $250 an hour and defendant incurred $38,456.73 in counsel fees and costs. Plaintiff's counsel stated that plaintiff incurred $56,532.92 in

fees and costs as to the current firm, as to her prior counsel, plaintiff incurred $23,478.38, and $13,835.05 for her expert's services. The amount sought for plaintiff's former attorneys was unsupported by a certification of services from her former counsel. Although plaintiff's counsel previously worked for the plaintiff's former attorneys, his certification only attached as an exhibit a statement generated by plaintiff's former counsel that listed the invoices owed by plaintiff to her prior attorney. The exhibit did not include a description of work completed by the former firm.

The court placed its oral decision on the record on December 21, 2018. As to defendant's claim that plaintiff materially breached the Agreement, the court found that there was "no proof . . . to substantiate" "defendant's allegations that . . . plaintiff's refusal to supply office information impacted his operat[ion of] the business," as the business had "been consistently run by defendant since" the Agreement was executed. The court observed "that there was no testimony provided by . . . defendant that the lack of . . . equipment and information stymied him in any fashion in the operation of the business."

Before addressing the remaining issues, the court placed its credibility determinations on the record. After reviewing numerous considerations and citing to specific examples in the parties' testimonies to support its conclusions,

16

the trial court found while plaintiff was emotional and rambling at times, her behavior was not "anything out of the ordinary." It found defendant to be "believable" and "measured" but concluded that there were numerous inconsistencies in defendant's testimony.

After discussing the credibility of the parties, the court determined that the PSA clearly demonstrated that plaintiff was to own the Ramsey property and defendant was to own the one in Hackensack. Therefore, the court required that within ninety days, the parties "effectuate the transfer of the Ramsey property into the sole name of . . . plaintiff," and remove defendant's name from the mortgage. A similar order was made pertaining to defendant's ownership of the Hackensack property. The court also amended the FRO and removed the Ramsey property as one of the places plaintiff was restrained from.

Next, the court concluded that because the distribution of Anchor was not addressed in the PSA, and, at the time the court entered the JOD, the parties planned to equally own and operate the business, Anchor was not subject to equitable distribution, but instead, was "subject to the law of contract construction." It found that although plaintiff used self-help in response to defendant's failure to make the required payments, by not providing defendant with 120 hours of training and Anchor's books and records, thereby technically

17

breaching the Agreement, her breach was not material. However, defendant's failure to pay was a material breach. The court held that defendant was obligated to make the purchase and income payments regardless of whether plaintiff worked, and the court insinuated that the employment provision may have simply been present "for tax planning purposes."

With no proof as to how plaintiff's breach impacted defendant, in formulating a remedy for defendant's breach, the court "reject[ed] the notion that . . . [defendant] should resume payments to . . . plaintiff on a monthly basis." Instead, it ordered that within ninety days, the remaining $107,500 owed towards the purchase loan with a $4000 credit based on defendant's previous payments, and $44,000 towards the guaranteed employment was to be paid to plaintiff in full.

The court then addressed the parties' debts and credits they each claimed. As to the Chase credit card referenced in the Agreement, the court required plaintiff to pay the amount due, but if there was money owed by the parties on another card, they were to share that obligation, as they were also to do with regard to the I.R.S. debt. As to credits, the court found that defendant was entitled to $2124.20, based on payments he made towards plaintiff's vehicle. As to payments plaintiff improperly received from Anchor customers, the court

found that although the parties' testimony was not clear, based on documents provided by defendant, he was also to receive a credit of $12,146.95 for checks plaintiff had received.

The court also conducted a detailed analysis of the parties' claims for counsel fees and costs, addressing each of the applicable factors under the court's rules. Based on its thorough analysis, the court concluded that an award of counsel fees to plaintiff in the amount of $65,000 was warranted, which included "out-of-pocket expenses and expert fees." It made no findings as to what amount of the counsel fees, if any, was attributable to plaintiff's prior attorneys. The court found support for the award in the PSA, as it stated that the prevailing party would be entitled to reasonable costs and attorneys' fees. It also found support in the fact that defendant acted unreasonably when he continually refused to consent to the FRO being amended to allow plaintiff to return to the Ramsey property. The court acknowledged that part of the dispute between the parties dealt with the interpretation of the Agreement, not the PSA, but found that "it was impossible to allocate . . . the amount of attorney[s'] fees that should be allocated towards the contract dispute and the amount that should be towards the matrimonial."

The court entered a final order on December 21, 2018. The order required defendant to pay plaintiff a total of $202,228.85 (Anchor purchase, income payments, and counsel fees). This appeal followed.[3]

Our review of Family Part orders is generally limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "We review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare, 154 N.J. at 413). Generally, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. of Am., 65 N.J. 474, 484 (1974)). We will not disturb the factual findings and legal conclusions unless convinced they are "so manifestly

---

[3] On December 28, 2018, plaintiff filed an application under an FV docket to have the FRO against defendant modified to bar him from the Ramsey property, but on January 15, 2019, that court denied the application because of a lack of documentation. Plaintiff filed another application that day, seeking the same relief, which the court, on February 19, 2019, again denied, this time because the appeal was pending. On April 15, 2019, plaintiff filed a motion to find defendant in violation of litigant's rights for failing to pay plaintiff according to the order under appeal. At that time, defendant cross appealed, seeking a stay of the motion pending appeal. The parties later reached an agreement, and a consent order was entered that required defendant to pay plaintiff $2500 a month and that the parties execute quitclaim deeds to each other for the Ramsey and Hackensack properties.

A-2281-18T2

unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (quoting Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015)). Challenges to legal conclusions, as well as a trial court's interpretation of the law, are subject to de novo review. Id. at 565.

We first address defendant's contention that the trial court was incorrect in concluding that the plaintiff did not materially breach the contract, as the "[p]urchase of the equipment, tools, vehicles, trailers, office equipment, customer invoices and the office computer [were] the 'essence' of the Agreement." He contends that plaintiff's breach of the contract removed defendant's duty "to continue to tender payments." Additionally, according to defendant, he has been "victimized in this proceeding," and the judge "has shown a propensity to rule in favor of . . . plaintiff since the inception of this matter." Defendant argues that the decision should be reversed, and at the very least remanded to the trial court for a new plenary hearing. We find no merit to this argument.

We conclude that the trial court properly reached its conclusion based upon the plain language of the Agreement and defendant's failure to demonstrate that he was in any way injured by plaintiff resorting to self-help when defendant

stopped making the required payments. The trial court determined the issue by examining the Agreement's "plain language . . . and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 115 (2006) (quoting State Troopers Fraternal Ass'n v. State, 149 N.J. 38, 47 (1997)). It did not violate the bar against a court "mak[ing] a contract for the parties or to supply terms that have not been agreed upon," but instead enforced the Agreement according to its clear terms. Schenck v. HJI Assocs., 295 N.J. Super. 445, 450 (App. Div. 1996). Moreover, it correctly recognized that the defendant's breach was material because the "essence of the contract" was his purchase of Anchor. Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961)). Under these circumstances, to the extent plaintiff did not perform her obligation to provide training or records, her performance was excused by virtue of defendant's material breach. Ibid.; see also Goldman S. Brunswick Partners v. Stern, 265 N.J. Super. 489, 494 (App. Div. 1993).

We turn to defendant's argument that the trial court's "interpretation of the . . . Agreement regarding the payment of [$44,000 in] income to . . . plaintiff [was] flawed and [was] not supported by contract law." Here again, defendant

contends that the trial court awarded plaintiff a better contract than was negotiated by the parties. Defendant asserts that because plaintiff failed to work at all, she did not provide weekly timesheets, and failed to provide defendant with the necessary training as stated in the Agreement, a lump sum payment of $44,000 was not warranted. We disagree.

Contracts between spouses are subject to the same legal principles that govern contracts between strangers. See Quinn v Quinn, 225 N.J. 34, 45 (2016). "[T]he law's goal on breach of contract is not to deter breach by compelling the promisor to perform, but rather to redress breach by compensating the promis[]ee." Holtham v. Lucas, 460 N.J. Super. 308, 320 (App. Div. 2019) (alterations in original) (quoting 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.18 at 301 (3d ed. 2004)). Compensatory damages, also known as expectation damages, are designed to "put the innocent party into the position he or she would have achieved had the contract been completed." Totaro, Duffy, Cannova & Co. v. Lane, Middleton & Co., 191 N.J. 1, 12-13 (2007). Since this type of damage is directly related to the breach, compensatory relief is awarded based on the parties' reasonable expectations, and a defendant is not chargeable for an unforeseeable loss. Donovan v. Bachstadt, 91 N.J. 434, 444 (1982).

Defendant's contentions are without merit. The Agreement guaranteed plaintiff a minimum of ten hours of employment a week at the rate of $20 per hour. While the Agreement also indicated that plaintiff would submit timesheets depicting the work completed, that was not a condition precedent to the payment plaintiff was entitled to from the Agreement. It is undisputed that defendant failed to make the payment to plaintiff on this provision of the Agreement and that plaintiff was entitled to the payment during the fifty-five-month period, totaling $44,000. The $44,000 is simply putting plaintiff in a position she would have been if defendant properly followed the Agreement. We have no reason to disturb this result.

Defendant also contends that the court committed reversible error by ordering defendant to pay a lump sum amount of $202,228.85 (Anchor purchase payments, income payments, and counsel fees), instead of monthly installments as the parties had negotiated and agreed upon. He asserts that the court's decision is "perplexing" as less than one year prior, the same court denied plaintiff's application for a lump sum payment of $60,000. Further, he argues that since the application for a lump sum payment was filed in 2017, "[t]here was no proof of any financial windfall to . . . [him] in this time period."

We conclude defendant's contentions in this regard is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Suffice it to say that the trial court's decision was based upon evidence adduced at the plenary hearing and not upon what the parties presented in their earlier motions. Moreover, there is no reason for the court to have ordered that defendant's payments to resume in 2019, the year in which the original purchase price was to have been paid in full. Under the circumstances, the trial court properly ordered the acceleration of the purchase price, which was almost due in full at the time, especially since that would have been the amount due if defendant had followed the terms of the Agreement.

We reach the same conclusion as to defendant's argument that the trial court should not have modified the FRO against plaintiff to allow her back into her home. Defendant argues that the court did not have jurisdiction to amend the FRO, especially after the court had previously denied plaintiff's motion to amend the FRO for a lack of jurisdiction. Defendant contends that he "was not provided with any notice or [an] opportunity to be heard on this issue."

Applying our deferential standard of review, see Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (explaining that this court will only reverse the judge's decision when it is necessary "to 'ensure that there is not a denial of

justice' because the family court's 'conclusions are [] "clearly mistaken" or "wide of the mark"'" (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008))), we conclude defendant's arguments here too are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We only observe that the trial court had authority to amend the FRO, see N.J.S.A. 2C:25-29(d), and, in light of defendant's acknowledgment of plaintiff's right to own and possess the Ramsey property, the trial court's order made perfect sense under the circumstances.

Defendant next argues that the trial court should have awarded him credit for $6991.50 defendant previously advanced to plaintiff for her vehicle. He contends that the judge failed to provide any reason for only issuing a credit in the amount of $2142.20. Similarly, he argues that the judge provided no reasoning for only awarding him a $4000 credit for payments made toward the Agreement instead of $8000, and $12,146.95 instead of $13,411.57 for payments made by defendant for Anchor.

Plaintiff concedes that the court miscalculated, and that defendant's calculation is correct as to the amount of the credits. However, plaintiff argues that at most $4613.92 should be credited because defendant never paid the $900 monthly for Anchor's rental space at the Ramsey property, which the trial court

never addressed. Additionally, plaintiff believes the mistake can be negated completely as plaintiff had a right to a percentage of Anchor's profits as stated in the Agreement, a claim that plaintiff did not raise before the trial court and for that reason was not addressed in the court's decision.

We conclude from our review of the record that, as the parties agree, the trial court incorrectly calculated the credits owed to defendant. Moreover, the court did not address the rental payments provided for in the Agreement or if defendant was obligated to pay portions of Anchor's profits to plaintiff. We are therefore constrained to remand the matter for the trial court to address the parties' contentions in this regard based upon the evidence presented at the plenary hearing.

Next, we consider defendant's challenge to the trial court's May 27, 2016 order fixing the amount of child support. According to defendant, it was improper for the trial court to have only required plaintiff to pay $20 in weekly child support payments without a hearing and without providing the parties the Guidelines. He contends that plaintiff earned more money than she stated on her case information statement. He also argues it was improper for the judge to have denied his request for a retroactive increase in child support payments

while at the same time requiring defendant to pay plaintiff $44,000 in income she did not earn.

At the outset, we observe that defendant never appealed from the order establishing child support. Neither his notice of appeal nor his appellate case information statement in this appeal identified that order as being challenged. Moreover, at the inception of the plenary hearing, the trial court specifically identified the issues it would be addressing, which did not include child support. Defendant never interposed any objection to the hearing being limited to those issues and instead, his attorney only stated that she planned on "renew[ing defendant's] child support application," and at the end of the plenary hearing, briefly raised arguments about child support in a post hearing submission to the court.

Under these circumstances, we will not consider defendant's challenge to child support in this appeal. See Campagna ex rel. Greco v. Am. Cyanamid Co., 337 N.J. Super. 530, 550 (App. Div. 2001) (refusing to consider an order that was not listed in the plaintiffs' notice of appeal); Sikes v. Township of Rockaway, 269 N.J. Super. 463, 465-66 (App. Div.) (explaining that an issue was not properly before this court since plaintiff did not raise the issue in his notice of appeal and he failed to file a relevant trial transcript with his appeal),

aff'd o.b., 138 N.J. 41 (1994); see also Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973) ("[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))); Correa v. Grossi, 458 N.J. Super. 571, 576 n.2 (App. Div. 2019) (refusing to consider arguments that were not properly presented to the trial court).

Finally, we address defendant's numerous challenges to the trial court's counsel fee award. Defendant argues that he did not act in bad faith, the court "ignored plaintiff's bad faith, failed to conduct a proper review to determine if the fees were reasonable and failed to consider plaintiff's ability to pay her own counsel fees." He contends that it also failed to apportion fees and costs between those associated with Agreement, which did not provide for an award of counsel fees, and those associated with matrimonial issues. Moreover, defendant argues that it was improper for the trial court to award counsel fees for plaintiff's prior counsel's work. Additionally, defendant contends that the court improperly awarded fees and costs based on plaintiff's medical issues even though plaintiff

did not include any evidence supporting her claims. Last, he asserts that the judge failed to consider the fees already paid by defendant.

An allowance for counsel fees and costs in a family action is discretionary. R. 4:42-9(a)(1); see also Williams v. Williams, 59 N.J. 229, 233 (1971); Kingsdorf v. Kingsdorf, 351 N.J. Super. 144, 157-58 (App. Div. 2002). We "will disturb a trial court's determination on counsel fees only on the 'rarest occasions, and then only because of a clear abuse of discretion.'" J.E.V. v. K.V., 426 N.J. Super. 475, 492 (App. Div. 2012) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)); Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008).

In a Family Part matter, the trial court may award counsel fees in its discretion subject to the provisions of Rule 4:42-9 and Rule 5:5-3(c), which are applicable "to enforcement of agreements between spouses." In determining the award, a judge should consider:

> (1) [T]he financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

[R. 5:3-5(c).]

All applications for counsel fees in family actions must also address the factors set forth in Rules of Professional Conduct (RPC) 1.5(a). R. 4:42-9(b). These include the reasonableness of the fees charged given the task and the skill level of the attorney. RPC 1.5(a). "In addition, the party requesting the fee award must be in financial need and the party paying the fees must have the financial ability to pay, and if those two factors have been established, the party requesting the fees must have acted in good faith in the litigation." J.E.V., 426 N.J. Super. at 493; N.J.S.A. 2A:34-23. "[T]he party seeking to be awarded attorneys' fees ordinarily bears the burden of proving that they are reasonable, and . . . contractual fee-shifting provisions are strictly construed." Green v. Morgan Props., 215 N.J. 431, 455 (2013); McGuire v. City of Jersey City, 125 N.J. 310, 326-27 (1991).

Applying these guiding principles, we conclude the trial court did not abuse its discretion in awarding plaintiff counsel fees rather than defendant, substantially for the reasons expressed by the trial court. Contrary to defendant's contentions, the court did consider plaintiff's actions with regard to the subject of the hearing and at least implicitly did not find she acted in bad faith. Nevertheless, we are constrained to remand the issue because the trial court

31

incorrectly included in the award the fees and costs charged to plaintiff by her former attorneys, for which there was no certification submitted under <u>Rule</u> 4:42-9 attesting to the time spent and the reasonableness of the charges.

In sum, we affirm the trial court's order except as to the credits it determined defendant was entitled to and as to the award of counsel fees to plaintiff that included the amounts charged by her former attorneys. As to both, we remand the matter for reconsideration of the credit issue and for correction of the counsel fee award.

Affirmed in part; remanded in part for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2281-18T2