946 A.2d 1097 (2008)
400 N.J. Super. 297
Ewelina NOWOSLESKA, Plaintiff-Respondent
v.
Marjorie STEELE, Wanda Dorsey and Douglas Dorsey, Defendants-Appellants.
No. A-5759-06T1
Superior Court of New Jersey, Appellate Division.
Submitted April 22, 2008.
Decided May 19, 2008.
*1098 Mauro, Savo, Camerino & Grant, P.A., Somerville, for appellants (Darren J. Leotti, of counsel and on the brief).
Andril & Espinosa, L.L.C., for respondent (William G. Sanchez, of counsel and on the brief).
Before Judges COBURN, GRALL and CHAMBERS.
The opinion of the court was delivered by CHAMBERS, J.A.D.
Defendants face ejectment from the house that has been the family home for forty-three years. They lost title to the house through a series of lending transactions that form the basis of this case. They appeal from the denial of their motion to set aside the default judgment awarding possession of the home to plaintiff, who now holds title to the property. Since the loss of the home may have resulted from predatory lending practices, in the interests of justice and due to these extraordinary circumstances, the default judgment should be set aside under Rule 4:50-1(f), so that the dispute can be resolved on the merits, and, if necessary, appropriate legal and equitable adjustments be made.

I
Defendant Marjorie Steele, eighty-three years old, has lived at 103 Spring Street, Somerville for the past forty-three years. It was her marital abode, and thereafter, ownership of the premises was shared with her daughter, defendant Wanda Dorsey, and son-in-law, defendant Douglas Dorsey. In June 2003, defendants obtained a loan of $95,000, representing monies for repairs and improvements to the premises and the consolidation of bills. The loan was secured by a mortgage. Defendants contend that they defaulted on the mortgage payments due to certain health-related issues that resulted in a loss of income. A judgment of foreclosure was obtained against *1099 them, and a sheriff's sale was scheduled for February 7, 2006.
The sheriff's sale was averted when defendants obtained a loan from Property Vestors for the amount of the mortgage delinquency. The promissory note that defendants executed with Property Vestors required them to pay back the principal amount plus interest within thirty days (by February 28, 2006). Apparently, defendants anticipated that they would be able to obtain sufficient monies from their 401(k) accounts to do so. Defendants maintain that they were told that if the monies were not paid, then Property Vestors would foreclose on the property. However, as part of the transaction, they had signed a Deed in Lieu of Foreclosure to Property Vestors as security for the loan. The promissory note provided that if the monies were not paid by February 28, 2006, Property Vestors would pay defendants $20,000 and, upon payment of an outstanding mortgage, would have all rights to the property.
To avert losing the property to Property Vestors, defendants obtained financing through Lenny Hernandez and Michael Figler of Equity Solutions, L.L.C. In the resulting transaction that took place on February 24, 2006, Figler took title to the property. He paid off the mortgage and liens and judgments on the property, which totaled approximately $145,000, plus title and closing costs of approximately $10,000. In addition, Figler included as part of his "purchase price" for the property the sum of $50,000 representing a fee to his company, Equity Solutions. Defendants signed a use and occupancy agreement that allowed them to remain on the premises for one year provided they made payments to Figler of $2,200 a month, and they had an option to buy back the property for $202,400 within one year (before February 24, 2007).
Defendants maintain that Figler represented that the monthly payments would be only slightly higher than their current $1,200 mortgage payment and that a portion of their home equity would be used to make these payments. They contend that they signed the documents understanding that they were obtaining a loan and that only later did they discover that they had signed a deed transferring title to the house to Figler. Figler arranged for an attorney to represent defendants for the transaction and maintains that defendants understood the nature of the transaction and agreed to it.
On April 24, 2006, after defendants defaulted on the payments, Figler transferred title to the property to plaintiff Ewelina Nowosleska for $260,000. Defendants assert that plaintiff is connected with Figler's business.[1] The papers indicate that the property was again transferred to Jean Sidibe for $405,000, and a mortgage has been recorded against the premises for that sum. Defendants maintain that Sidibe is also associated with Figler. Assuming that $405,000 represents the value of the property, defendants were thus induced to part with title to property valued at $405,000 in order to pay off debts totaling $145,000.
Since defendants made no payments under the use and occupancy agreement, plaintiff commenced this ejectment action. Defendants were served on August 24, 2006, but failed to file an answer. As a result, default was entered, and plaintiff's unopposed motion for a default judgment was granted. The default judgment entered on January 9, 2007, gave plaintiff possession of the premises.
*1100 Almost four months later, on April 25, 2007, defendant filed an emergency application to vacate the default judgment. That application was denied on May 11, 2007. Defendants' motion for reconsideration was also denied. This appeal followed. The trial court has issued a stay pending appeal.

II
Rule 4:50-1 sets forth various circumstances in which a party may obtain relief from a final judgment or order, including "(a) mistake, inadvertence, surprise, or excusable neglect; . . . or (f) any other reason justifying relief from the operation of the judgment or order." The decision on whether to vacate a judgment under the terms of this rule is left to the sound discretion of the trial court and will not be overturned on appeal absent a mistaken exercise of that discretion. Mancini v. EDS, 132 N.J. 330, 334, 625 A.2d 484 (1993).
When exercising that discretion on an application to vacate a default judgment, courts must exercise "great liberality" and "should tolerate `every reasonable ground for indulgence'" with a view to opening default judgments in order "that a just result is reached." Ibid. (quoting Marder v. Realty Constr. Co., 84 N.J.Super. 313, 319, 202 A.2d 175 (App. Div.), aff'd, 43 N.J. 508, 205 A.2d 744 (1964)). Indeed, New Jersey courts have always had the inherent equitable power to vacate judgments and, with respect to default judgments, have exercised great liberality in doing so in order that cases may be decided on the merits. Loranger v. Alban, 22 N.J.Super. 336, 342, 92 A.2d 77 (App.Div.1952). A court's liberality in vacating default judgments is justified, since a default judgment is based on only one side's presentation of the evidence without due consideration to any countervailing evidence or point of view, and, thus, may not be a fair resolution of the dispute. As a result, on a motion to vacate a default judgment, "[a]ll doubts . . . should be resolved in favor of the parties seeking relief." Mancini v. EDS, supra, 132 N.J. at 334, 625 A.2d 484.
Defendants maintain that they are entitled to relief under subsection (a) of Rule 4:50-1 due to their excusable neglect. However, defendants did not provide any explanation in their certifications submitted below stating why they failed to answer the complaint.[2]
Defendants also contend that they are entitled to relief under subsection (f) of Rule 4:50-1. Subsection (f) allows a judgment to be set aside in "exceptional situations." Id. at 336, 625 A.2d 484. "And in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice." Ibid. (quoting Court Inv. Co. v. Perillo, 48 N.J. 334, 341, 225 A.2d 352 (1966)). In determining whether relief is warranted under this section of the rule, courts focus on equitable considerations. Hous. Auth. of Morristown v. Little, 135 N.J. 274, 294, 639 A.2d 286 (1994).
Generally, relief under subsection (f) is applied "sparingly, in exceptional situations" to prevent grave injustice. Cmty. Realty Mgmt., Inc. v. Harris, 155 N.J. 212, 237, 714 A.2d 282 (1998) (quoting Hous. Auth. of Morristown v. Little, supra, 135 N.J. at 289, 639 A.2d 286). Further, the policy in favor of the finality of judgments plays a larger role in applications brought under subsection (f) than the other subsections. First Morris Bank & *1101 Trust v. Roland Offset Serv., Inc., 357 N.J.Super. 68, 71, 813 A.2d 1260 (App. Div.), certif. denied, 176 N.J. 429, 824 A.2d 157 (2003). Nonetheless, that interest in repose must be "weighed in the balance with the equally salutary principle that justice should be done in every case." Hodgson v. Applegate, 31 N.J. 29, 43, 155 A.2d 97 (1959).
When the application is to vacate a default judgment, subsection (f) is applied more liberally. In Davis v. DND/Fidoreo, Inc., 317 N.J.Super. 92, 100-01, 721 A.2d 312 (App.Div.1998), certif. denied, 158 N.J. 686, 731 A.2d 45 (1999), this court stated, in the context of an application to vacate a default judgment, that:

R. 4:50-1(f) calls for the exercise of sound discretion, "guided by equitable principles, and in conformity with the prescription that `any doubt should be resolved in favor of the application to set aside the judgment to the end of securing a trial upon the merits.'" (quoting Goldfarb v. Roeger, 54 N.J.Super. 85, 92, 148 A.2d 189 (App.Div.1959) (quoting Loranger v. Alban, supra, 22 N.J.Super. at 342, 92 A.2d 77)).
An application for relief from a default judgment under subsection (f) is treated "indulgently." Mancini v. EDS, supra, 132 N.J. at 336, 625 A.2d 484.
Allowing the default judgment to stand in this case may result in a grave injustice. These defendants may have been the victims of predatory lending practices. While predatory lending is a general concept not subject to precise definition,[3] one authority has described it as:
a mismatch between the needs and capacity of the borrower . . . In essence, the loan does not fit the borrower, either because the borrower's underlying needs for the loan are not being met or the terms of the loan are so disadvantageous to that particular borrower that there is little likelihood that the borrower has the capability to repay the loan.
[Assocs. Home Equity Servs., Inc. v. Troup, 343 N.J.Super. 254, 267, 778 A.2d 529 (App.Div.2001) (quoting Daniel S. Ehrenberg, If the Loan Don't Fit, Don't Take It: Applying the Suitability Doctrine to the Mortgage Industry to Eliminate Predatory Lending, 10 J. Affordable Housing & Community Dev. L. 117, 119-20 (Winter 2001)).]
The facts suggest that defendants have lost a house valued at $405,000 in exchange for payment of debts totaling only $145,000. One of the defendants, an elderly woman, has lived in the house for forty-three years. Defendants seek to assert numerous defenses to this ejectment action including a contention that the transaction *1102 was fraudulent. They may also argue that it was unconscionable. Federal and state statutes may provide protection. We note further that defendants' neglect does not appear to be calculated or willful. See Mancini v. EDS, supra, 132 N.J. at 336, 625 A.2d 484 (noting, when vacating a default judgment pursuant to subsection (f), that defendant's conduct was neither willful nor calculated). If allowed to stand, the default judgment in this case may result in the kind of grave injustice that subsection (f) is designed to prevent. The default judgment should have been vacated, and the order denying defendants' application to do so is reversed.
NOTES
[1] In her complaint, plaintiff states that her address was 331 Chestnut Place, Piscataway, the same address Figler listed as his address on the deed to plaintiff.
[2] Defendants' attorney below claimed excusable neglect because defendants did not know they had any defense due to their unsophistication.
[3] See HUD-Treasury Task Force on Predatory Lending, Curbing Predatory Home Mortgage Lending 17-24 (June 2000), available at http:// www.huduser.org/Publications/pdf/treasrpt. pdf (discussing predatory lending in general and the difficulty in providing a definition of predatory lending). Predatory lending includes "the practice of making loans containing interest rates, fees or closing costs that are higher than they should be in light of the borrower's credit and net income, or containing other exploitative terms that the borrower does not comprehend." Henry v. Lehman Commercial Paper, Inc. 471 F.3d 977, 984 (9th Cir.2006); see also Debra Pogrund Stark, Unmasking the Predatory Loan in Sheep's Clothing: A Legislative Proposal, 21 Harv. BlackLetter L.J. 129, 134 (2005) (stating that "predatory lending is the situation where a mortgage broker or mortgage lender engages in fraudulent, deceptive or sharp practices to induce borrowers (often the elderly or minorities) to enter into `bad' loans," which would include loans that are overpriced, loans where there is no net economic benefit to the borrower, loans where the borrower cannot afford the payment so the lender is relying on the borrower's equity for payment, and loans with other exploitative terms not understood by the borrower).