**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2732-22

RICHARD T. ROSS,

 Plaintiff-Respondent,

v.

VALERIE M. ROSS,

 Defendant-Appellant.

_____

Argued November 19, 2024 – Decided March 5, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-0177-18.

Marisa Lepore Hovanec argued the cause for appellant (Gomperts McDermott & Von Ellen, LLC, attorneys; Marisa Lepore Hovanec, of counsel and on the briefs).

Kristin S. Pallonetti argued the cause for respondent (Law Office of Steven P. Monaghan, LLC, attorneys; Kristin S. Pallonetti, on the brief).

PER CURIAM

In this post-judgment dissolution matter, defendant, Valerie M. Ross, challenges two orders of the Family Part: (1) a February 24, 2023 order denying as untimely her motion to vacate a prior order compelling her to execute the Qualified Domestic Relations Orders (QDROs) prepared by the parties' jointly-chosen expert despite her objection to its accuracy, and (2) a March 28, 2023 order modifying plaintiff's child support obligation to $419 per week. Having reviewed the record in light of the applicable legal principles, we vacate and remand for further proceedings in accordance with this opinion.

I.

As defendant appeals two distinct judgments, we briefly summarize separately their pertinent facts and procedural histories, addressing first the QDRO dispute.

A.

Plaintiff and defendant were married in March 2005, and share four children born between 2007 and 2013. After commencement of the underlying divorce action in 2017 and the mediation that followed, a dual judgment of divorce was entered in October 2018, incorporating a May 21, 2018 Term Sheet executed by both parties.

2

Concerning distribution of retirement assets, the Term Sheet in pertinent part reflected the parties' agreement:

> 28.  [Plaintiff] and [defendant] have acquired interests in retirement and tax-deferred plans (hereinafter "retirement plans")[.]  In particular, [plaintiff] has a pension through [the Police and Firemen's Retirement System] PFRS, which is in pay status, a MetLife Preference Plus annuity, which [plaintiff] represents is an exempt asset[], and a Wells Fargo IRA. [Defendant] has a McGraw Hill 401(k) and a Merrill Lynch account which [defendant] represents contains a premarital Roth IRA of approximately $22,000.00, a premarital Boeing 401(k)[,] and a marital McGraw Hill 401(k) rollover, with a date of complaint value of $88,212.00 assuming the Roth IRA is included in those numbers.
>
> . . . .
>
> 30.  [Plaintiff] represents that his MetLife Plus annuity is premarital and not subject to equitable distribution. It is [defendant]'s position that the Merrill Lynch account valued at approximately $198,312.00 has a marital component of $88,212.00.  These positions are subject to verification by Lois Fried, or her designee, who will be preparing the necessary QDRO[]s to effectuate an equal distribution of the marital value of the parties' retirement and tax-deferred accounts.  Each party has an affirmative obligation to provide Lois Fried with proofs relative to their representations of exempt status.  If proofs are not provided for any such asset, that asset shall be considered marital.  As [defendant] and [defendant]'s financial advisor both represent that date of complaint statements for the Merrill Lynch account are not available, [defendant]'s proofs may be by other documentation.

A-2732-22

[(Emphasis added).]

The Term Sheet memorialized the "intent of the parties to equalize the marital portions of their retirement plans and tax-deferred accounts." Accordingly, upon the parties' divorce, their expert, Lois Fried, CPA, undertook the QDRO analysis. It appears undisputed that, almost immediately, defendant delayed in providing the necessary documentation to conduct the analysis and prepare the QDROs. Thereafter, plaintiff filed several motions from January 2020 through April 2022, seeking to enforce litigant's rights and compel defendant's compliance with the QDRO preparation process set forth in the Term Sheet.[1]

On March 6, 2020, after considering plaintiff's first motion to enforce the Term Sheet, the motion judge, who had also finalized the parties' divorce, ordered "that the parties shall continue with the process of distributing retirement assets as per the Term Sheet entered on May 21, 2018, within fourteen . . . days." (Emphasis added). The court prospectively ordered that if defendant failed to provide the necessary information to Fried, the expert review and calculations "shall proceed as if the accounts were marital per the [T]erm

---

[1] Each motion was handled by a different judge, and ultimately four judges addressed the QDRO issue at various stages.

4

[S]heet" (emphasis added), finding the "Term Sheet provide[d] for this relief." The judge further ordered that defendant "execute all necessary QDRO[]s prepared by . . . Fried . . . for the distribution of retirement assets within ten . . . days." Defendant neither sought reconsideration nor appealed the court's order.

Extensive correspondence followed between the parties' attorneys and Fried.[2] By letter dated May 8, plaintiff's counsel requested that Fried finalize the QDROs for signature as the court's fourteen-day deadline for defendant to submit documentation to Fried had "since passed," and "[d]efendant failed to provide proof that any accounts were exempt," requiring Fried to "proceed as if the accounts were marital."

An email to Fried from defendant's "recently engaged" new counsel dated May 22, advised he was "gathering information and document[s]" in order to "demonstrate" certain retirement assets were not subject to distribution. In correspondence from June 2020, defendant's counsel indicated his

---

[2] Plaintiff's certification reflects that, throughout the marital litigation, defendant changed attorneys several times, replacing counsel three times during the course of this post-judgment litigation. The record reflects delays related to these changes and some uncertainty expressed by new counsel at times regarding the precise time and nature of any production of documents or information to Fried.

"understanding that prior counsel provided documentation to demonstrate the pre/non marital component of [defendant's] retirement accounts." Plaintiff's counsel responded that the QDROs would be finalized in accordance with the March 2020 order as defendant's time to provide information "expired." Correspondence also reflected defendant did not pay her share of Fried's retainer.

Defendant provided some documentation, causing Fried to request additional records related to withdrawals, deposits, transfers, or rollovers into and from certain accounts, without which Fried could not confirm their premarital status. When additional information was not readily provided, Fried conducted the assessment with the information already supplied, and the findings were emailed to the parties in July 2020.

Fried acknowledged defendants' accounts appeared to be potentially exempt, but in accordance with the Term Sheet, provided the following preliminary determination:

> 1) Mr. Ross's Wells Fargo Roth IRA appears to be 100% exempt.
>
> 2) Mr. Ross's MetLife Annuity appears to be 100% exempt.
>
> 3) Ms. Ross's current McGraw Hill 401(k) appears 100% marital as of the end of coverture.

6

4)    For Ms. Ross's Merrill Lynch Roth IRA, to substantiate that it was 100% exempt, <u>we had requested the date of the 2005 deposit to JMS 1469-4821 and statements for the duration of the coverture period showing no deposits during the marriage. We did not receive that so this will be treated as 100% marital.</u>

5)  For Ms. Ross's Merrill Lynch IRA, to determine if any or all portion of it was exempt, <u>we requested year-end statements for the duration of the coverture period for the JMS and all rolled over funds. We did not receive that so this will be treated as 100% marital.</u>

6)  For Ms. Ross's BMS accounts, statements indicate her employment ended in January 2005, which was before the date of marriage. The 401(k) was liquidated. <u>The account itself appears to be 100% exempt. We have no proofs of whether it was transferred to another account.</u>

7)  For Ms. Ross's Boeing VIP, I believe all we have is a statement from 2004. <u>Given this was before the marriage, all of the December 31, 2004 balance is exempt. The account itself appears to be 100% exempt. We have no proofs of whether it was transferred to another account.</u>

[(Emphasis added).]

Applying these findings, Fried concluded plaintiff was entitled to $116,151.18 from defendant's retirement assets. Fried explained, "[t]his [wa]s the best resolution [she] c[ould] conceive with the information [she] ha[d]," but requested the parties advise if there were any accounts or proofs she "overlook[ed]," or the calculations would stand.

7

Defendant rejected Fried's calculations as incorrectly deeming her exempt assets as marital and refused to execute the QDROs. Plaintiff thereafter agreed to allow defendant additional time to submit proof of her allegedly exempt assets to Fried. Intermittent correspondence reflects that deadline also passed. An email from defendant's counsel to plaintiff's counsel and Fried indicated that defendant was in the process of obtaining additional information from defendant's financial advisor, Jerry Davidse, and asked for a "brief extension."

Apparently in February 2021, nearly four months after the parties' agreed-upon deadline passed, defendant sent additional documents electronically to Fried.[3] Upon receiving the information, Fried requested an additional retainer to review the documents because there were new never-before-provided records pertaining to certain accounts. Plaintiff objected and demanded defendant bear the cost of Fried's additional work.

The next correspondence provided to us appears to be a June 2021 email from defendant's counsel claiming that "[defendant's] information/documentation [was] provided numerous times before" and agreeing to pay Fried's additional retainer "on the condition that [plaintiff's]

---

[3] Importantly, we note that the parties have not provided any correspondence or inventory demonstrating the precise documents or information provided to Fried or when.

 A-2732-22

accounts [also] be properly examined and analyzed" because "[defendant] found documentation that was not provided from another Wells Fargo account of [plaintiff]'s that is subject to distribution." Defendant's counsel also claimed defendant "made repeated offers, through her counsel, to have . . . Davidse, available to discuss her accounts" but "Davidse was never consulted, despite suggestions that he would be."

A reply email from Fried in February 2021 indicated she reviewed defendant's latest document production for purposes of determining whether "they were duplicative but not for substance." To review the information and determine whether it substantiated defendant's claims of exempt assets, Fried agreed to "honor the $1,250 quoted for the analysis" and required the parties to execute an engagement agreement for the additional service.

On June 29, 2021, plaintiff filed a motion seeking enforcement of the first motion court's March 2020 order requiring defendant to execute the QDROs, and defendant filed a cross-motion seeking a plenary hearing "to [allow the c]ourt [to] review and analyze all appropriate information and documentation necessary to finalize the QDROs." Following oral argument before a new motion judge on November 15, 2021, the court ordered in relevant part that: (1) defendant pay Fried's additional retainer to review the additional documents; (2)

9

both parties confirmed "all documents ha[d] been submitted to the [e]xpert but not reviewed," and "any additional information required by [e]xpert of an individual party [had to] be provided within [five] days of the request being made"; (3) the parties would work with Fried to finalize the QDROs and split the fee for any additional requests by the expert for information; (4) upon supplying Fried with any requested documents, "[d]efendant [was required to] execute the QDRO[s] within ten . . . days" of finalization; and (5) defendant's request for a plenary hearing for the court to "review and analyze all appropriate information and documentation necessary to finalize the QDROs" was denied, but "[i]f the final attempt to work with the [e]xpert" in accordance with the order was "unsuccessful[,] the [p]arties [could] make further application to th[e] [c]ourt requesting the same."

Defendant apparently paid the additional retainer fee on November 29, 2021. However, it appears defendant refused to execute Fried's retainer agreement, claiming it contained release language with which she took issue, leading plaintiff to file another motion in April 2022, in which he sought to compel defendant to execute the retainer agreement as ordered.

Specifically related to the QDRO issue, plaintiff also requested the court: (1) compel defendant to pay fees necessary to finalize the QDROs and execute

all documents including Fried's retainer agreement within five days or issue a warrant for her arrest; (2) order defendant's monthly pension payments from plaintiff's retirement pension deposited into her attorney's trust account until the QDROs are finalized; and (3) withhold defendant's monthly pension check proceeds until plaintiff received his share. Importantly, plaintiff sought that the court "require the QDROs be finalized within thirty . . . days without further documents or analysis submitted to the expert as pre[v]iously agreed to by the parties."

Plaintiff emphasized that defendant agreed and represented to the second motion court in November 2021 that "all submissions of all documents were made to . . . [Fried]" by that time; yet, defendant failed to comply with the court's order that "any additional information required by the [e]xpert of an individual party [was required to] be provided within [five] days of the request being made." Plaintiff argued the time for defendant to provide such proofs had expired.

Plaintiff also alleged that "[d]efendant, through counsel, requested that . . . Fried . . . return the retainer fee as the defendant was hiring another expert" and "still failed to execute the retainer [a]greement." However, at oral argument, defendant advised she executed the retainer agreement the night prior.

11

Plaintiff argued defendant's financial advisor provided no documents and "ha[d] no proof" that defendant's assets were pre-marital, as required. Plaintiff's counsel represented that he never objected to Fried's communicating with Davidse; rather, he "had objected to having a telephone conference with him until [Fried] had an opportunity to review the documents."

Defendant, through new counsel, responded that she originally retained her own expert to conduct an independent QDRO analysis in March 2022, who was ultimately "unable to assist," causing her to retain a new expert, Rodney D. Troyan, Esq., in June 2022. She asserted that she hired Troyan as Fried's "calculations h[ad] been and w[ould continue to] be inaccurate because she ha[d] not spoken to [her] financial advisor (Jerry Davidse) who ha[d] all of the information and documentation to confirm the premarital components of [her] retirements accounts." Defendant claimed plaintiff's counsel refused to permit Davidse to assist Fried despite his ability to "explain in detail what accounts [she] had at the time of [the] marriage, how those accounts were rolled over without contribution during the marriage and the status of those accounts . . . ." Defendant maintained "the issue really [wa]s [about] . . . the calculation" and she wished to challenge the inaccurate distribution of her premarital exempt assets.

A-2732-22

Defendant cross-moved for various relief, seeking an order denying plaintiff's motion as it pertained to the QDROs entirely, and, in relevant part, requesting an order deeming "the marital portion of . . . [p]laintiff's non-retirement Wells Fargo investment account be subject to the distribution between the parties," and an "[o]rder directing [p]laintiff to provide all statements of his non-retirement Wells Fargo investment account from the date of the marriage through the date of Complaint by a date certain with distribution to occur within a fixed timeframe . . . ."

On July 22, 2022, a third motion judge heard oral argument and granted plaintiff's requested relief in part, ordering that defendant cooperate with Fried to complete the QDRO. The court recognized "[t]he issue of the QDROs ha[d] been an ongoing issue since the parties were divorced almost four . . . years ago." The judge ordered defendant to execute Fried's retainer agreement within five days,[4] finding, "[b]ased upon review of all the exhibits provided by both litigants, . . . that . . . [d]efendant . . . continually failed to abide by the [o]rders of the court in this regard." Referencing Fried as the parties' "jointly chosen expert," the judge found defendant "intentionally stall[ed] the process in <u>bad</u>

---

[4] The record reflects that defendant had executed the engagement letter the day before the July motion arguments.

faith."  The judge further ordered it would "entertain [p]laintiff's request for counsel fees for the necessity of filing . . . the . . . motion with regard to the QDRO issues."

The order reflected the court's determination that "[t]he Term Sheets of the parties do NOT allow for a change in experts if the result is not that which the party thinks is appropriate.  This was a joint expert chosen by the parties who were, at the time, both represented by very competent matrimonial counsel."  The court declined plaintiff's request for "a bench warrant if [d]efendant fail[ed] to comply" but ordered instead, "[i]f [d]efendant fail[ed] to finalize the QDRO[]s within ten . . . days of being provided with same, her pension benefits w[ould] be deposited in her attorney's trust account until they are finalized . . . ."  (Emphasis omitted).

The court then further provided that "[d]efendant may always seek a second opinion after the QDRO[]s are finalized and take appropriate action if warranted.  If this remedy is required, [d]efendant's attorney shall provide an accounting of said deposits."  (Emphasis omitted).

The judge explained its reasoning at oral argument:

> [Fried] was an agreed upon joint expert.  The parties are bound, in this court's view, by the court order to utilize . . . Fried and to allow the QDROs to be

finalized.  <u>And if [defendant is] not satisfied, then she can file a motion at a later point in time.</u>

But we're not going to have a situation where . . . Fried finally gets to prepare the QDRO[s], and then we're going to get into a fight of the experts, and Mr. Troyan comes up with a different calculation. That's not the point of the QDROs.

That does not satisfy the spirit and intent of the [T]erm [S]heet that was prepared by the two parties and incorporated into a Judgment of Divorce. . . .  [T]he result of six or seven orders before this [c]ourt became involved indicat[es] that it needs to go forward.  I think that's been made perfectly clear at this point in time.

[(Emphasis added).]

Defendant did not seek reconsideration of or appeal the July 2022 order.

Fried moved forward and conducted a final calculation considering all information provided by both parties to date, which did not change from the original assessment two years earlier.  Specifically, on September 3, 2022, Fried sent an email to counsel advising the following:

We reviewed our file in full after we were in receipt of [defendant]'s signed engagement agreement and the retainer we had requested.  We still do not see documentation that substantiates the transfers of exempt balances that were said to have occurred.  At your request, we can make assumptions to calculate marital balances as if transferred funds were exempt. If . . . Davidse has documentation of the exempt components or you would like us to make such

15

assumptions, we certainly can, but please consider that any further work will be at our hourly rates.

Defense counsel replied stating,

> Because you were prevented from speaking to . . . Davidse for this purpose, [defendant] has retained Rodney Troyan at great expense to calculate her premarital retirements funds. He had full access to . . . Davidse and is in the process of preparing his calculations.
>
> I will provide same to you . . . upon completion as was my intention before receiving your email. However, as [defendant] was forced to retain a separate expert to do essentially what could have been done by you had you been permitted access to . . . Davidse, she will not pay for you to perform the same calculation that Mr. Troyan is now undertaking.

Fried eventually finalized the QDROs. Nevertheless, defendant did not execute the QDROs, but did, in accordance with the July 22 order, commence deposits of her pension payments into her attorney's trust account and continues to do so. She continued her efforts to obtain a calculation from Troyan, with Davidse's assistance, to establish that Fried's conclusions were erroneous.

Troyan completed his analysis of the parties' retirement accounts, which he memorialized in a formal report dated September 28, 2022. Troyan's report provided a breakdown of his calculations and concluded that a portion of the assets Fried designated as marital for distribution purposes were defendant's

16

premarital funds exempt from equitable division; and, therefore, plaintiff was only entitled to $65,000 from defendant's retirement accounts, not the full $116,151.18, as calculated by Fried. Troyan also determined that plaintiff's submissions regarding the premarital nature of his MetLife Annuity accounts were insufficient to support a finding that any portion of his retirement accounts were exempt as the statements provided were dated June 30, 2017, while the parties were married. Notably, the Troyan report reflects conversations and information provided by Davidse. Defense counsel forwarded the report to plaintiff's counsel by letter on October 12, 2022.

Defendant subsequently filed a motion on November 8, 2022, under Rule 4:50-1(f), seeking to vacate the portions of the July 2022 order requiring defendant to execute the Fried QDROs, challenging their accuracy based upon Troyan's report. Defendant also requested the court compel plaintiff to provide Troyan with the documentation necessary to properly calculate any premarital portion of plaintiff's MetLife annuity.

Defendant argued that compelling her to sign the inaccurate QDROs would be "inequitable and unjust," explaining she was left with "no other choice" than to hire Troyan to assist in showing the error in the Fried calculation,

as plaintiff would not allow Fried to consult with her financial advisor who would have assisted Fried in analyzing the documents.

Plaintiff countered arguing that defendant's financial advisor never provided the necessary documents in a timely manner as required by the Term Sheet and defendant should not now be permitted to switch experts.[5]

After oral argument on February 24, 2023, the court issued a written order denying defendant's motion to vacate as out of time. The court found the application to "implement a QDRO that was years in the making and ha[d] been an ongoing issue in this litigation which was filed months after the QDRO was supposed to have been signed pursuant to multiple prior [c]ourt orders, was not brought within a reasonable time as required for relief."

The order further stated:

> Defendant claims that their own expert has a differing valuation from that presented by the parties' jointly-appointed expert, and that accepting . . . Fried's valuations would be "unjust, oppressive and

[5] At the conclusion of oral argument, plaintiff's counsel requested the opportunity to make inquiry of Troyan regarding his calculations and asked that the court's order reflect "that [plaintiff] can have communication with . . . Troyan to try to determine how [Fried was] getting a different number." Defendant's counsel responded that "Troyan can speak with anybody at any time . . . . It's not an issue at all. If Ms. Fried wants to talk to . . . [Davidse], or is permitted to do so, absolutely fine." The court responded, "you don't need a court order for that."

inequitable." Although [d]efendant disagrees with the determination of the parties' jointly chosen expert, as the [c]ourt noted in its July 22, 2022 [o]rder, the parties' Term Sheet does "NOT allow for a change in experts if that result is not that which the party thinks is appropriate."

Despite multiple [c]ourt [o]rders requiring [the QDROs prepared by Fried] to be executed . . . these documents were not signed, leading to [paragraph two] of the [c]ourt's July 22, 2022 [o]rder requiring that, if the [d]efendant fails to sign the QDRO[s] within ten days of being provided it, her pension benefits would be deposited into her attorney's trust account until finalized. Those benefits have been deposited into [d]efendant's attorney's trust account for the past five months. . . . Rather than comply with the [c]ourt's multiple orders to sign the QDRO[s], [d]efendant brought the present motion [o]n November 22.

The court ordered defendant to "execute the QDROs within ten . . . days to finalize this matter." The court similarly denied defendant's request to compel plaintiff to provide additional evidence of his MetLife annuity, concluding, "[d]efendant's effort to undermine the determination of the parties' jointly selected expert because [she] disagree[s] with that expert's findings does not justify re-litigating the matter or further delaying the implementation of the QDROs to distribute the parties' retirement assets."

B.

While litigating the QDROs, the parties contemporaneously litigated the recalculation of defendant's child support obligation. The original agreed-upon child support amount reflected in the parties' Term Sheet had been previously modified in April 2022. Plaintiff filed a motion seeking the court recalculate the support amount, retroactive to January 1, 2022. Defendant similarly requested that the child support determination be retroactive to January 1, 2022. The court heard oral argument on July 22, 2022 and issued an order, providing, in relevant part:

> Plaintiff's [m]otion to apply the recalculation of child support retroactively to January 1, 2022 as per the January 25, 2022 Order is GRANTED. The recalculation should be based on [p]laintiff's previous submissions and the re-occurring expenses. The [c]ourt, sua sponte, [o]rders counsel to confer and submit a proposed [Child Support Guidelines Worksheet] to the [c]ourt within thirty . . . days detailing the appropriate parameters used in the calculation.
>
> [(Emphasis omitted).]

The parties apparently did not reach an agreement regarding the amount. Thus, when defendant filed her November 2022 motion to vacate the July 22 QDRO, she again requested the court recalculate child support. She sought an increase of plaintiff's support obligation to $507 per week based upon

20

defendant's proposed Child Support Guidelines Worksheet, claiming plaintiff was exercising no overnight parenting time "and as there is no predicting at present when that will ever occur, no credit for same should be applied to the child support calculation." Defendant submitted her Case Information Statement (CIS) dated June 30, 2022 and plaintiff's CIS dated July 27, 2022.

Plaintiff cross-moved, claiming he was paying costs for extra-curricular activities and the child support calculation did not include the alimony and pension payments defendant was receiving. Plaintiff argued plaintiff's child support obligation should be set at $362 per week. His guidelines accounted for "pension income for both parties[,] reoccurring expenses for work related childcare . . . [and plaintiff's] reoccurring extra-curricular expenses." Plaintiff's sole parenting worksheet accounted for defendant's exercising 339 overnights and plaintiff exercising 26 overnights annually.

At oral argument, defendant asserted that plaintiff was impeding his overnights with the children, claiming "[t]here's essentially no parenting time occurring" because plaintiff refused to engage in reunification therapy. Plaintiff countered that "[d]efendant was ordered to schedule an appointment with a therapist" and never signed an authorization for the parties to begin attending therapy.

The court reserved its decision on child support, affording plaintiff an opportunity to submit a proposed Child Support Guidelines Worksheet with "a detailed breakdown of [his] recalculation of child support along with supporting documentation" because defendant's counsel had previously provided a supplemental memorandum supporting her recalculation of child support.

The court then issued an order on March 28, 2023, setting plaintiff's child support obligation at $419 per week, finding defendant earned an annual income of $96,607.17 and plaintiff earned an annual income of $223,766.75. The court calculated child support, listing plaintiff's overnights at eighty-eight nights annually, despite neither party suggesting that number.

II.

Defendant appeals from the court's February 24, 2023 and March 28, 2023 orders.

Regarding the February 2023 order, defendant argues the motion court abused its discretion by denying defendant's request to vacate paragraphs two through five of the July 2022 order compelling defendant to execute the QDROs prepared by Fried without a plenary hearing. She asserts that: (1) under Rule 4:50-1(f) "the motion was brought within a reasonable time[]"; and (2) "[a] genuine issue of material fact existed as to the premarital portions of the parties'

retirement assets" requiring a hearing. Defendant asserts her motion is timely and "could not [have been] filed sooner . . . because [d]efendant had to wait for her expert, . . . Troyan, to complete his report in order to show the QDROs she had previously been ordered to sign were unfair." Defendant claims Troyan's report "was, at the very least, eviden[ce]" that portions of defendant's assets were exempt and that "created a genuine issue of material fact sufficient to warrant relief." Therefore, defendant argues, "the trial court was constrained to hold a plenary hearing to correctly adjudge whether [d]efendant was entitled to relief from the [o]rder under [Rule] 4:50-1(f)."

Plaintiff contends that the court properly denied defendant's motion to vacate portions of the July 2022 order because defendant "was not seeking exceptional relief which would be needed to achieve equity and justice." Plaintiff emphasizes defendant's delay in producing statements to substantiate her claims that certain assets were exempt, arguing defendant "had four years to provide paperwork which supported her claims that a portion of her retirement accounts was not subject to equitable distribution." He maintains defendant "never once provided this documentation to the parties' joint expert, to . . . plaintiff[,] or to the [c]ourt" and "has still not provided this information."

As to the court's March 28, 2023 child support order, defendant contends the $419 amount was based on eighty-eight overnights, "a plainly erroneous number" as "[a]t a maximum . . . plaintiff has [twenty-six] overnights with the children." Defendant further argues the court utilized "an income for [p]laintiff that fail[ed] to account for his interest and investment earnings."

Plaintiff contends the trial court utilized the appropriate number of overnights, as defendant "interfere[d] with [plaintiff]'s parenting time," and delayed reunification therapy which would allow plaintiff to exercise overnights. With respect to plaintiff's income, he argues the court utilized the correct income because "the capital gains and distributions [plaintiff] received were a one-time event and not recurring."

## III.

We address defendant's claims, mindful that our review of Family Part orders is generally limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We "accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 413). "Thus, 'findings by the trial court are binding on appeal when supported by adequate, substantial,

credible evidence.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (quoting Cesare, 154 N.J. at 411-12).

We will not disturb a family court's factual findings unless convinced they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (quoting Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015)); however, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## A.

Addressing the order denying defendant's motion to vacate the July 22, 2022 order requiring defendant to "execute the completed QDROs within ten . . . days of the entry of th[e] [o]rder," we recognize "[a] trial court's determination under [Rule 4:50-1] warrants substantial deference and should not be reversed unless it results in a clear abuse of discretion." U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012). Rule 4:50-1 is "designed to reconcile the strong interests in finality of judgments and judicial efficiency with

the equitable notion that courts should have authority to avoid an unjust result in any given case." Mancini v. EDS, 132 N.J. 330, 334 (1993) (quoting Baumann v. Marinaro, 95 N.J. 380, 392 (1984)). "Regardless of the basis, vacation of a judgment under Rule 4:50-1 should be granted sparingly." In re Guardianship of J.N.H., 172 N.J. 440, 473-74 (2002).

Here, plaintiff sought relief under Rule 4:50-1(f). Deemed the "catchall" category, subsection (f) allows the court to vacate a final judgment for "any other reason justifying relief from the operation of the judgment or order." R. 4:50-1(f). To warrant relief, the movant must demonstrate that the circumstances are "exceptional," and that enforcement of the order or judgment would be unjust, oppressive, or inequitable. See Nowosleska v. Steele, 400 N.J. Super. 297, 304 (App. Div. 2008); City of E. Orange v. Kynor, 383 N.J. Super. 639, 646 (App. Div. 2006). "No categorization can be made of the situations which would warrant redress [but] . . . in such exceptional cases its boundaries are expansive as the need to achieve equality and justice." Ct. Inv. Co. v. Perillo, 48 N.J. 334, 341 (1966); see also DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 269-71 (2009).

Procedurally, a motion under subsection (f) must be made in reasonable time after the judgment. See R. 4:50-2; see also M & D Assocs. v. Mandara,

26

366 N.J. Super. 341, 351-52 (App. Div. 2004). The "extent of the delay in making the application for relief, the underlying reason or cause, fault, or blamelessness of the litigant, and any prejudice that would accrue to the other party," are all factors that must be considered in deciding whether relief on a Rule 4:50-1(f) motion is appropriate. In re. Guardianship of J.N.H., 172 N.J. at 474 (quoting C.R. v. J.G., 306 N.J. Super. 214, 241 (App. Div. 1997)). A critical element in the timeliness of a motion under Rule 4:50-1(f) is when a party first discovers the facts underlying the application. See Palko v. Palko, 73 N.J. 395, 398 (1977) (rejecting plaintiff's application to reopen a final judgment under Rule 4:50-1(f) because she made her motion twenty-six months after the entry of judgment and more than a year after the probate of her husband's will and therefore did not meet the "exceptional circumstances" required by Rule 4:50-1(f)).

Here, the court denied defendant's motion to vacate as untimely, noting defendant's prior delays in executing the QDROs as ordered and the "five-month delay" from the July 22 order, and finding the motion "was not brought within a reasonable time." The court did not address the merits of defendant's claim that the Troyan report reflected that Fried's calculations erroneously deemed

27

defendant's premarital retirement assets to be marital and plaintiff's marital accounts to be exempt and premarital.

We recognize defendant was in large part responsible for delaying the QDRO preparation process and that both plaintiff and the court provided her considerable latitude in not enforcing the Term Sheet's provisions sooner. However, we cannot concur that defendant's motion to vacate was untimely, as it was filed five months after the July 2022 order—not an unreasonable delay in time given that Fried did not finalize the QDROs until September and Troyan did not complete his conflicting assessment until September 28, 2022.

After Fried issued her initial report, defendant immediately objected to the calculations. Despite defendant's delays, plaintiff granted her extensions of time to provide information and the court, although disapproving of defendant's delay and compelling defendant's continued cooperation with Fried, twice acknowledged an opportunity for her to later challenge Fried's determination if warranted. Indeed, the July 22 order provided that "[d]efendant may always seek a second opinion after the QDROs are finalized and take appropriate action if warranted."

Defendant's "action" after the QDROs were finalized was the filing of a motion to vacate and compel a plenary hearing. She asserted that Fried

incorrectly calculated the distribution and that "compelling [defendant] to sign" and lose her assets would be "unjust." She presented Troyan's report to support her argument. Because we find the filing was not completed in an unreasonable amount of time, we conclude the court mistakenly exercised its discretion in not addressing the merits of defendant's motion.

The court also found that defendant failed to "comply with . . . multiple orders to sign the QDRO[s]," and "[a]lthough [d]efendant disagree[d] with the determination of the parties' jointly chosen expert, . . . the parties' Term Sheet does [not] allow for a change in experts . . . ." However, as noted, the second and third motion judges, while compelling defendant's cooperation with Fried, referenced a potential pathway for the parties to challenge Fried's determination.

Therefore, the court should have considered substantively whether defendant's contentions, now supported by Troyan's report, warranted vacating the order enforcing the QDROs.

IV.

Defendant also challenges the motion court's March 28, 2023 order awarding $419 in child support, contending the court "miscalculated child support" by relying on "a plainly erroneous number of parenting time overnights for [p]laintiff" and "an income for [p]laintiff that fail[ed] to account for his

29

interest and investment earnings." Defendant asserts plaintiff does not exercise eighty-eight annual overnights with the children, and, although disputed, "[a]t a maximum, he has [twenty-six] overnights with the children."

Plaintiff counters defendant "interfere[d] with [plaintiff]'s parenting time," preventing plaintiff from exercising parenting time on any holidays since 2018, and has delayed reunification therapy, despite court orders instructing the parties to engage in such services. Therefore, plaintiff argues, "the [trial court] correctly utilized the appropriate number of overnights." As to plaintiff's income, plaintiff contends that "[t]he [c]ourt utilized the correct income for . . . [plaintiff] as the capital gains and distributions he received were a one-time event and not recurring."

"[O]ur review of the Family Part's determinations regarding child support is limited." Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 587 (App. Div. 2016). "When reviewing decisions granting or denying applications to modify child support, we examine whether, given the facts, the trial judge abused his or her discretion." J.B. v. W.B., 215 N.J. 305, 325-26 (2013) (quoting Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012)). The decision "will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to

reason or to other evidence, or the result of whim or caprice." Id. at 326 (quoting Jacoby, 427 N.J. Super. at 116).

"The fairness of a child support award resulting from the application of [the child support] guidelines is dependent on the accurate determination of a parent's net income." Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6, ¶ 12, www.gannlaw.com (2025). A parent's income, for purposes of calculating a child support obligation, is "gross income minus income taxes, mandatory union dues, mandatory retirement, previously ordered child support orders and, when appropriate, a theoretical child support obligation for other dependents." Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A ¶ 11. Gross income includes "all earned and unearned income that is recurring or will increase the income available to the recipient over an extended period of time." Child Support Guidelines, Pressler & Verniero, Appendix IX-B to R. 5:6A, www.gannlaw.com (2025).

When calculating child support, "[t]he [c]ourt shall develop a factual basis, memorializing its decision, in writing or on the record, as to whether to impute income to a parent and, if so, the amount, using appropriate State statutes, procedures, case law, and legal processes in establishing and modifying

31

support obligations." Id. ¶ 12(d); see also Loro v. Colliano, 354 N.J. Super. 212, 220 (App. Div. 2002) (instructing "the litigants, counsel and this court, in the event of review, are entitled to clearly delineated and specific findings addressing the statutory factors relevant to any award or modification of child support").

We are unpersuaded by defendant's claim that the child support calculation should have included plaintiff's investment earnings from his 2021 tax return. Those investment earnings were a one-time payment for a sale of stock and is not recurring year to year. We discern no abuse of discretion in the trial court's calculating plaintiff's child support obligation without accounting for the investment earnings on his 2021 tax return.

However, there was no support for the court using eighty-eight overnight visits with plaintiff in its calculation of child support. See R. 1:7-4. The parties do not dispute that plaintiff's own Sole Parenting Worksheet included only twenty-six overnight stays; nor do they dispute that defendant's Worksheet attributed zero annual overnights to plaintiff.

Therefore, we vacate the portion of the court's order awarding child support to plaintiff in the amount of $419 weekly, based on the court's assuming without explanation plaintiff exercises eighty-eight overnights. We remand the

matter to the Family Part to determine the number of actual overnights plaintiff exercises annually and recalculate child support accordingly.

We reverse the February 24, 2023 order and remand to the trial court for consideration of defendant's motion to vacate that order. We vacate the portion of the March 2023 order regarding the calculation of child support and remand for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division